ANGELO RESENDES *vs.* BOSTON EDISON COMPANY.

No. 93-P-1515.

Suffolk. December 5, 1994. - April 6, 1995.

Present: PERRETTA, SMITH, & IRELAND, JJ.

*Practice, Civil*, Discovery, Instructions to jury. *Evidence*, Expert opinion,
    Prima facie evidence, Regulations, Safety standards. *Proximate Cause.*
    *"Dig Safe" Statute. Department of Public Utilities. Administrative*
    *Law*, Evidence, Record, Regulations. *Negligence*, Duty to warn.

At a civil trial, the judge did not abuse her discretion in not excluding the
    testimony of the plaintiff's expert, who was identified approximately
    one month before trial by a supplemental response to an interrogatory,
    where the defendant did not seek to depose the expert, or seek a contin-
    uance, and raised the matter only at a lobby conference immediately
    preceding empanelment of the jury. [350-351]
At the trial of a negligence action, testimony of the plaintiff's expert con-
    cerning the likely cause or causes of the plaintiff's injuries was properly
    admitted, and the evidence on causation was more than sufficient to
    withstand a motion for a directed verdict on a motion for judgment
    notwithstanding the verdict. [351-353]
At the trial of a negligence action, the judge correctly redacted expressions
    of opinion, conclusions and evaluation from a Department of Public
    Utilities decision rendered under the "dig safe" statute, G. L. c. 82,
    § 40, which the defendant sought to admit in its entirety as a public or
    official record, where nothing in the statute expressly provided for the
    admission of such a decision in its entirety [353-355]; further, error, if
    any, in the judge's redaction was harmless in the circumstances [355].
At the trial of a negligence action against an electric utility, there was no
    error in the judge's instructions to the jury with regard to the notice the
    defendant had received of possible excavation activity near its lines or
    with regard to additional safety precautions the defendant should have
    taken if it knew or should have known of the excavation. [355-357]
At the trial of a negligence action against an electric utility arising from a
    construction worker's electrocution after coming in contact with an
    electric line during an excavation, the judge did not err in instructing
    the jury that they could consider violations of the utility's standards,
    industry standards, or government regulations as evidence of negligence
    if they found that the purpose of the standards and regulations was for
    the safety of workers like the plaintiff. [357-359]

CIVIL ACTION commenced in the Superior Court Department on February 1, 1991.

The case was tried before *Patti B. Saris*, J.

*Thomas D. Burns* (*John J. McGivney & Patricia B. Gary* with him) for the defendant.

*Philip N. Beauregard* (*Eli M. Nefussy* with him) for the plaintiff.

*Henry C. Luthin & David R. Hegarty*, for Boston Water and Sewer Commission, amicus curiae, submitted a brief.

IRELAND, J. While working in a trench at a construction project, the plaintiff suffered severe injuries when he struck an underground power line of the defendant, Boston Edison Company (Boston Edison). As a result, he sued Boston Edison for negligence. A jury found Boston Edison eighty percent negligent and awarded damages of $5,500,000 for the plaintiff's injuries, which amount was reduced in the judgment to $4,400,000, based on the jury's apportionment of twenty percent of the negligence to the plaintiff.

Boston Edison appeals from the judgment, claiming the following errors: (1) the judge should have excluded the plaintiff's expert from testifying to alternate theories of liability when those theories were not raised until shortly before trial and where the expert's identity was not disclosed to the defendant until shortly before trial; (2) the judge should have directed a verdict in Boston Edison's favor because the plaintiff produced no evidence that his injuries were caused by Boston Edison's actions; (3) the judge should not have excluded from evidence an administrative decision of the Department of Public Utilities (DPU) that the plaintiff's employer had violated G. L. c. 82, § 40, the "dig safe" statute, in failing to provide required notice of excavation activities; (4) the judge should not have instructed the jury to determine whether Boston Edison had a duty either to warn the plaintiff as to the dangerous character of its underground power line or to monitor the construction project[1]; and (5) the judge should not have allowed the jury to consider evi-

---

[1] In its brief the defendant delineated a separate and final argument on the issue of the nonexistence of any duty on its part to the plaintiff. This

dence of Boston Edison's violation of certain internal, governmental, and industry standards pertaining to installation of its underground power line.

On the evidence presented, the jury could have found the following facts. On June 12, 1990, approximately one month before the accident, the plaintiff's employer, Healy Construction Co. (Healy), was hired to repair a broken water main which had caused flooding in the parking lot adjacent to a building located at 470 Atlantic Avenue in Boston. Before starting the work, Healy notified the "dig safe" agency, a private organization established by the public utility companies to handle and coordinate the notices to utility companies by contractors planning to excavate in areas where public utility lines are located. Such notices are required by G. L. c. 82, § 40 (the "dig safe" statute). Healy was given an emergency "dig safe" approval form, with the designation "N.O.W.," meaning that excavation would start immediately, because of the extensive flooding in the building's parking lot caused by the broken main. The "dig safe" form would expire once the emergency was over. As required by the statute, the utility companies, including Boston Edison, alerted by the "dig safe" notice, marked the areas and locations of their underground lines. Because the precise location where excavation would occur was not known at the time of the marking, Boston Edison designated where its lines and ducts were, both in the parking lot and in the neighboring portion of Atlantic Avenue.

Healy started excavating in the parking lot and located first one, and later another, rupture in the water main. The plaintiff, who was the job foreman, found the water main and other utility lines, including Boston Edison's electric line, lying in a common trench, with Boston Edison's line resting on top of the water main. A contractor approved by Boston Edison was dispatched to the scene where he broke away the electric line's protective concrete casing, fireproofed and boxed the energized cables inside, while the plaintiff and his

argument is addressed in our discussion of the five issues outlined and will not be separately considered.

work crew repaired the water main. This accomplished, the water main was then covered with sand, the Boston Edison line reencased in concrete, the trench backfilled, and the building's water service restored.

While performing this work, Healy discovered that only one pipeline supplied the building's entire water needs. The city of Boston required two — one for domestic water supply and one for the building's fire sprinkler system. Accordingly, at the request of the property owner, Healy set about to install the required second line. Healy planned to install the second water line by taking a more direct route across Atlantic Avenue that would bypass most of the parking lot where the earlier work had been done. Healy obtained permits from the Boston public works department, the Boston transportation department, and the Boston Water and Sewer Commission (the commission). These permits expired July 7, 1990, two days before the accident. Healy did not, however, notify the "dig safe" agency of the additional nonemergency work which was to take place in the same general area where Boston Edison had already marked the location of its lines and ducts.

On or about June 29, 1990, Healy commenced excavation across Atlantic Avenue and discovered an agglomerate of cables and utility lines at the bottom of the trench. The plaintiff and other Healy employees carefully worked around most of the network of cables until they unearthed Edison's line, a 13.8 kilovolt duct. Three to five inches (or more) below and running parallel to it, a brick structure resembling on old sewer line was discovered. The space between the Boston Edison line and the old sewer line was insufficient to allow for installation of the new water line. The plaintiff consulted with Healy and was told that, according to the commission, the sewer structure was abandoned and, therefore, the plaintiff should remove several courses of brick from it to create enough room to lay the water line beneath the Boston Edison duct.

Using an air-driven chisel gun (referred to at trial as a "chipping gun"), the plaintiff and a coworker, Marcellino

Almas, took turns working in the bottom of the trench on the night of July 9, 1990. The jury heard conflicting testimony as to whether the two worked only at breaking away the brick on the sewer structure or may also have chipped away part of the protective concrete casing, or sleeve, on the Boston Edison duct. The plaintiff testified that, just before the accident, he was in the trench resting on one knee while he held the chipping gun "downwards" at an angle breaking away pieces of the brick. The plaintiff received severe injuries when the chisel on the gun slipped and penetrated the concrete sleeve, striking the live 13.8 kilovolt cable inside. Because of his injuries he remembered nothing about the accident. At trial, the plaintiff (an experienced foreman on this type of project) admitted he was aware of the risk of receiving an electric shock if the chipping gun were to slip and pierce the duct. In addition, the jury heard testimony that the plaintiff had been warned by a Boston Edison inspector during the earlier parking lot excavation not to touch Boston Edison's ducts but to wait for a Boston Edison-approved crew to perform the necessary work.

Considerable evidence was elicited at trial concerning Boston Edison's installation in 1986 of the 13.8 kilovolt line. Boston Edison ran the line parallel to and slightly above the old brick sewer line, which was not depicted on any recent commission plan of its active, operating sewer and water lines. There was a dispute, however, as to whether the sewer structure was, in fact, abandoned. In any event, the commission had reviewed and approved Boston Edison's 1986 installation plan for the duct with conditions stamped on the plan that "[n]o . . . duct . . . shall be placed nearer than one foot of a water or sewer pipe" and that "[n]o structure shall be laid over a . . . sewer pipe and running parallel with such . . . sewer pipe, thereby preventing access to it from the surface of the street." Code 19 and Article 449 of Boston Edison's internal standards, reprinted below in the margin,[2]

---

[2]Boston Edison's Code 19 contains the following standards:

"*FOREIGN STRUCTURES*

"1. When excavating, care shall be taken not to interfere with cables, water or gas fixtures, connections with sewers, conduits, manholes or any

contained a somewhat similar provision that "[u]nderground services shall have a horizontal separation of at least twelve inches from all other services or systems." The plaintiff also produced evidence that Boston Edison had violated its own standards by failing to use plastic spacers along the side of the duct that would have provided a more rigid structure around which to pour and form the concrete sleeve. As a possible result, the concrete surrounding the duct, according to one expert, had "longitudinal fractures," suggesting it was brittle and weak, and, hence, easily penetrated.

Because it had received no "dig safe" notice of the work being done on Atlantic Avenue, apart from the emergency notice it had received for the earlier parking lot work, Boston Edison denied knowledge of Healy's or the plaintiff's activities and also denied that it had a duty to warn the plaintiff of the dangers of excavating around its lines. Had Boston

---

other pipes or structures in the street without the consent of the proper parties. When crossing or running parallel with these objects, they shall be secured in place until the work is completed. Minimum clearance from all structures shall be observed as outlined in the Company's publication, "Information and Requirements for Electric Service", dated October, 1961, Page 27, Article 449. However, the clearances required in any municipality may be greater and if so, the Contractor shall be responsible for meeting the requirements.

". . .

"A. *Conduit laying.* . . .

"5. Conduit shall be laid with joints set with a #2 PB compound, or equivalent, so as to make a water-proof joint. Approved spacers shall be used to give correct spacing of ducts. All ducts shall be wired together. The pour shall be monolithic (except in congested areas where such construction is not practicable as determined by the Engineer).

"6. Before any conduit is laid without the use of spacers (i.e. the layer method) a concrete base not less than three (3) inches shall be laid to line and grade and properly compacted."

* * * *

"ARTICLE 449: *Separation from Other Services or Systems.* Underground services shall have a horizontal separation of at least 12 inches from all other services or systems. In case of unavoidable crossing, the electric service shall be kept at least 6 inches away from other services or systems.

"Underground services may be laid in the same trench with telephone, water, gas, or similar services, provided the clearances specified in the preceding paragraph are maintained."

Edison known of the renewed construction work near its lines, a construction supervisor for Boston Edison, Paul Roche, testified, "I would have had an inspector go by that job every evening . . . and I would have made sure that when [the plaintiff] was excavating in the area of our duct line, it was not touched. . . ." For his part, the plaintiff claimed that a certain unnamed or unidentified Boston Edison employee did, in fact, know about the work being done on Atlantic Avenue.

1. *Late identification of an expert witness.* Throughout much of the pretrial period, the plaintiff based his theories of negligence on Boston Edison's failure to monitor the job on Atlantic Avenue and on its violation of standards for proper clearance in placing its duct too close to the brick sewer line. Approximately one month before trial was to begin, the plaintiff identified Gerard M. Angers as a testifying expert who would advance the added theory that Boston Edison was negligent in designing the duct because it failed to use plastic spacers and to assure proper concrete insulation of the energized cables inside. Boston Edison complains it was unfairly prejudiced as it was not "seasonably" informed through the plaintiff's supplemental responses to interrogatories of the identity of an expert who would testify to a newly articulated theory of liability. See Mass.R.Civ.P. 26(e) (1) (B), 365 Mass. 776 (1974). Boston Edison, however, did not raise this issue until the lobby conference immediately preceding empanelment of the jury. The trial judge denied Boston Edison's motion to exclude the plaintiff's expert witness.

"The conduct and scope of discovery is within the sound discretion of the judge." *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 799 (1987). Her decision will not be disturbed on appeal absent a "showing of prejudicial error resulting from an abuse of discretion." *Ibid.* As the plaintiff points out, Boston Edison failed to object to the plaintiff's supplemental response identifying the expert when it was first notified a month before trial. Boston Edison also did not raise the issue at the final pretrial conference one week before trial, did not seek a continuance of the trial date in

order to prepare for Angers's testimony, and did not seek to depose him before trial. In those circumstances, there was no abuse of discretion in allowing him to testify. See *Giannaros* v. *M.S. Walker, Inc.*, 16 Mass. App. Ct. 902 (1983) (expert identified ten days before trial allowed to testify, where the defendant had time in which to seek a continuance of the trial date but failed to do so, and where issue of expert's being allowed to testify was not raised until expert had been sworn and questioned about his credentials). Compare *Kearns* v. *Ellis*, 18 Mass. App. Ct. 923 (1984) (expert identified two days before trial excluded from testifying); *DiBiase* v. *Rowley*, 33 Mass. App. Ct. 928 (1992) (alternate plan of land development first offered by plaintiff on the day of trial in eminent domain case excluded). Absent here is the sort of unfair surprise which rule 26 seeks to prevent.

2. *Causation.* Boston Edison claims that the plaintiff's showing on causation was "nonexistent" and, therefore, the court should have allowed its motion for a directed verdict. More specifically, Boston Edison claims that the plaintiff's expert testimony was based on assumptions of facts not in evidence, was framed in terms of possibilities, not probabilities, and generally was insufficiently grounded in the evidence.

As an example, Boston Edison contends that, contrary to the plaintiff's own testimony that he was holding the chipping gun "downwards" when the accident occurred, the plaintiff's expert, Angers, assumed in his testimony that the plaintiff was holding the gun "in a horizontal position," thereby making it quite easy for the chisel to bounce up off the brick sewer structure and strike the Boston Edison duct inches above. The plaintiff demonstrated for the jury the angle at which he best remembered holding the gun — an angle neither strictly horizontal nor vertical. It was within the jury's factfinding role to determine what the angle was and, more important, to determine the likelihood of mishap based on that angle. Angers's testimony did not preclude the plaintiff's version of events.

Beyond the matter of the angle at which the chipping gun was operated, Angers also testified that Boston Edison's placement of the duct only inches above the sewer structure was a "highly contributing factor," as it forced the plaintiff to work in an unreasonably confined area where he had to break away bricks from the sewer structure to create space for the water line. To counter Boston Edison's claim that the plaintiff had intentionally chipped at the concrete sleeve to create the needed space, Angers testified that an inspection of the portion of the duct the plaintiff struck — together with a photograph of the same, showing a "black mark" on the bottom side where the chipping gun had pierced the concrete casing — revealed no damage from the gun other than that single point of penetration. Angers additionally testified that the concrete casing around the duct had been improperly poured, that "longitudinal fractures" in the concrete suggested it was weak and brittle, and that, generally, it failed to meet industry standards. Angers's testimony on this point made it more probable than not that the plaintiff's chipping gun would easily penetrate through the concrete sleeve to the energized cables inside. All of this was evidence on the issue of causation, and it was for the jury to determine the weight to be given to it.

Contrary to Boston Edison's assertion, Angers's testimony, when taken with other supporting evidence offered by the plaintiff, including certain exhibits and the testimony of the plaintiff himself, was not impermissibly conjectural, speculative, or based on remote possibilities rather than probabilities. Angers cast his opinion as a "reasonable explanation" of how the accident occurred. See *Commonwealth* v. *Nadworny*, 396 Mass. 342, 358-359 (1985), cert. denied, 477 U.S. 904 (1986). Where other evidence of causation has been shown, expert testimony is admissible to show that scientific evidence is not inconsistent with the claimed cause. That alternate possibilities of causation may exist does not render the testimony inadmissible. *Ibid.* See also *Simmons* v. *Monarch Mach. Tool Co.*, 413 Mass. 205, 213 (1992); *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290, 302 (1992).

The plaintiff's expert's testimony concerning the likely cause or causes of the plaintiff's injuries was properly admitted, and the evidence on causation was more than sufficient to withstand either a motion for directed verdict or one for judgment notwithstanding the verdict. Smith & Zobel, Rules Practice § 50.6 (1977).

3. *Failure to provide "dig safe" notice.* After conducting an adjudicatory hearing, the DPU issued a written decision in which it ruled that the plaintiff's employer, Healy, had failed to comply with the seventy-two hour notice requirement of the "dig safe" statute and that no emergency existed that would exempt Healy from that requirement when construction work was commenced on Atlantic Avenue. The report concluded that Healy "violated the Dig Safe Law when it failed to exercise reasonable precaution when excavating at 470 Atlantic Avenue in Boston . . . on July 9, 1990." Healy was fined $200, the maximum allowable penalty.

Boston Edison sought to admit an unredacted copy of the DPU decision as a public or official record. In its offer of proof, Boston Edison cited the "dig safe" statute, which provides that "damage to a pipe, main, wire or conduit" from one who excavates without first giving the statutorily required notice is "prima facie evidence in any legal or administrative proceeding that such damage was caused by the negligence of such person." G. L. c. 82, § 40, par. 6, as appearing in St. 1983, c. 353, § 40. Relying on *Adoption of George*, 27 Mass. App. Ct. 265, 273-274 (1989), the judge ruled that those portions of the DPU decision containing expressions of opinion, conclusions, or evaluation, as opposed to primary facts, would be redacted from the document as inadmissible hearsay. Based on this ruling, the eight-page report was reduced to a three-sentence document which was then read to the jury.

Boston Edison argues that the language quoted above from par. 6 of the "dig safe" statute "makes certain conditions prima facie evidence in civil . . . proceedings," *Shamlian* v. *Equitable Acc. Co.*, 226 Mass. 67, 70 (1917), and that the statute creates an unambiguous legislative modification of

the traditional common law rule excluding as hearsay con-
clusory or evaluative statements within official records. Ex-
clusion of most of the DPU report, according to Boston
Edison, "crippled the defense." Boston Edison urges that the
report should have been admitted in its entirety as conclusive
proof of Healy's failure to provide "dig safe" notice and as
prima facie evidence both that it excavated negligently and
that its actions, rather than Boston Edison's, caused the
plaintiff's injuries.

This argument has two flaws. First, Boston Edison at-
tempts to read par. 6 of the statute too broadly to include a
legislative directive that a DPU *document* or *record*, gener-
ated after a hearing under the statute, must be admitted as
evidence in a subsequent proceeding. Nowhere in the statute
does language to that effect appear. "[W]e decline to imply
language which the Legislature has omitted," *Beeler* v. *Dow-
ney*, 387 Mass. 609, 617 (1982), particularly where, unlike
here, the Legislature has expressly provided elsewhere in the
general laws for the admission of specific records or docu-
ments as prima facie evidence in legal proceedings. See, e.g.,
G. L. c. 46, § 19 (*certificate of records* of town clerk as to
birth, death, or marriage admissible); G. L. c. 140, § 121A
(*certificate* of department of public safety official that an
item is a "firearm" is prima facie evidence of such finding);
G. L. c. 231, § 102C (*decision* by a District Court in transfer
or retransfer of case to Superior Court is prima facie evi-
dence). Had the Legislature intended a DPU decision ren-
dered under the "dig safe" statute to be admitted in its en-
tirety as an official document it would have so provided in
the statute.

Second, Boston Edison interprets the DPU decision and
the statute more favorably to its cause than is justifiable. The
DPU decision states merely that Healy "failed to exercise
reasonable precaution [i.e., was negligent] when excavating."
Under par. 6 of the statute, that ruling provides prima facie
evidence that the damage to Boston Edison's cable — not the
injuries to the plaintiff — resulted from Healy's negligence.
A utility line — even a defective one improperly or negli-

gently installed — could well be damaged through excavation done in violation of "dig safe." Yet, in an unwarranted leap of logic, Boston Edison attempts to extend the scope of the prima facie evidence that is allowed by c. 82, § 40, par. 6, to include evidence, as well, that the plaintiff's injuries were caused by Healy's actions. The DPU report was properly excluded if offered as evidence for that proposition.

Beyond that, if we assume (without so deciding) that the judge erred by applying the common law rule in *Adoption of George, supra,* for redacting statements of judgment or opinion from business or public records, *id.* at 274, rather than applying an exception to that rule from the statute's sixth paragraph, the error was harmless. Boston Edison suffered little or no prejudice as a result of the judge's ruling. It was uncontroverted at trial that, other than the original notice in June, 1991, for the emergency work in the parking lot, Healy provided no "dig safe" notice. Boston Edison was also allowed to provide proof that the damage to its cable was caused by the actions of the excavator. Finally, the jury were instructed in detail as to the significance of this evidence in light of the "dig safe" statute and were also quoted the entire language from the statute's sixth paragraph. There was no error requiring reversal as a consequence of the judge's ruling to exclude most of the DPU report.

4. *Jury instructions on notice and duty to warn.* In her charge, the judge instructed the jury to determine whether Boston Edison "knew or should have known of the excavation in the street . . . and should have taken additional precautions like providing an inspector or warning of dangers." [3] In

---

[3]This portion of the judge's charge is as follows:

"When a public utility is notified of an excavation project which may subject its wires or conduits to greater than usual risk of penetration or breakage, it is up to you the jury to determine whether in all the circumstances the utility company should have supplied an inspector to take special precautions against the risk or should warn the contractor and the employee of the damages [*sic*]. It is up to you to determine whether Boston Edison or its agents or employees knew or should have known of the excavation in the street and whether it should have taken additional precautions like providing an inspector or warning of dangers."

so charging the jury, the judge reasoned that, even absent proper "dig safe" notice, Boston Edison may have had constructive (or actual) notice of Healy's activities on Atlantic Avenue with, under *Yukna* v. *Boston Gas Co.*, 1 Mass. App. Ct. 62 (1973), the possible resulting duty to monitor the construction site or to warn of the potentially dangerous character of its underground lines. Boston Edison argues that this portion of the charge was error. It claims that, because Healy failed to notify the "dig safe" agency, it could not be charged with knowledge of Healy's activities and, therefore, it was relieved of any duty to take safety precautions around the excavation.

The short answer to this argument is that "dig safe" notification does not provide the exclusive means for putting a utility company on notice of possible excavation activity occurring near its lines. The plaintiff testified about conversations, during the Atlantic Avenue work, that he had with an unnamed Edison employee, who was apparently familiar with the inherent dangers of 115 kilovolt lines (and presumably with 13.8 kilovolt lines as well). From this evidence, the jury could infer Boston Edison's knowledge of work being done on Atlantic Avenue near its lines. This evidence, coupled with earlier warnings given Healy, or the plaintiff, during their emergency work in the parking lot, by a Boston Edison inspector not to perform work on the 13.8 kilovolt line, could also give rise to a duty to warn or to monitor the Atlantic Avenue construction site. Moreover, a utility company's duty to monitor or warn is not limited to those obligations enumerated in the "dig safe" statute, cf. *Yukna* v. *Boston Gas Co.*, 1 Mass. App. Ct. at 66 (imposing common law duty on defendant gas company, beyond the requirements of c. 82, § 40, to exercise high degree of care due to explosive nature of its gas lines when ruptured). As the judge stated in her charge, Boston Edison could have known that its lines were possibly subject to a "greater than usual risk" from the plaintiff's activities.

It was not error to instruct the jury that they could look elsewhere than the "dig safe" statute for notice to the de-

fendant; and, if found, they could also find — consistent with the testimony of Boston Edison's witness, Paul Roche — a resulting duty to monitor the construction site with Boston Edison inspectors or otherwise to warn the plaintiff.

5. *Instruction on significance of violations of regulations.* Considerable evidence was elicited regarding Boston Edison's possible violations of certain governmental, industry, or internal regulations and standards for proper installation of underground electrical lines and ducts. In her charge,[4] the judge instructed the jury that it could consider such violations, if it first determined that one of the purposes of the requirements was to protect persons like the plaintiff.[5] The judge later denied Boston Edison's alternate motions for judgment notwithstanding the verdict and for a new trial, writing, in relevant part:

> "[T]here is sufficient evidence from which the jury could have found that Boston Edison violated its own internal standards, government requirements, and industry standards in placing the 13.8 KV duct too close to the old brick sewer structure: that the purpose of these standards was to give workers like [the plaintiff]

---

[4]Although there may not have been an appropriate objection, we discuss this issue, and we find no error in the instructions as given.

[5]The judge charged the jury as follows:

"You've heard testimony concerning the purpose of those conditions placed on the Boston Water and Sewer plan. If you find that the conditions for the work were solely for the use of Boston Water and Sewer, specifically to enable Boston Water and Sewer to work on its equipment and to make any repairs, you shouldn't consider violations as a cause of the accident. However, if you find that the purpose of the regulations was to protect persons like Mr. Resendes working nearby in the street, you may consider it as evidence of negligence, although, once again, not conclusive evidence of negligence.

"I stress that throughout this discussion because there are lots of things that you may consider: violations of statutes, violations of custom and practice in the industry, violation of a company's own procedures. I've talked about all of them, but none of them are conclusive. Ultimately, you are the final arbiter of what is reasonable care of a public utility company under the circumstances in this case."

safe access for the installation of other pipes under congested streets."

Boston Edison maintains that the judge's charge and her ruling on its motions were in error because there was no evidence either that it violated its own standards pertaining to installation of lines within specified distances of other lines or that the purpose of those standards is to protect persons like the plaintiff.

It has long been the established rule in the Commonwealth that violation of a statute or regulation, while not negligence per se, is "evidence of negligence on the part of a violator as to all consequences that the statute, ordinance or regulation was intended to prevent." Nolan & Sartorio, Tort Law § 227, at 375 (2d ed. 1989), quoting from *Guinan* v. *Famous Players-Lasky Corp.*, 267 Mass. 501, 516 (1929). Furthermore, regulations or standards, such as those here at issue, "may serve more than one purpose." *Id.* at 378, citing *Stimpson* v. *Wellington Serv. Corp.*, 355 Mass. 685 (1969) (primary purpose of G. L. c. 85, § 30, is to protect public ways from damage due to overloaded vehicles; secondary purpose is to prevent injury to persons and private property from such vehicles, *id.* at 689-690 & n.2). See also *Memmolo's Case*, 17 Mass. App. Ct. 407, 412 & n.6 (1984) (purpose of "dig safe" statute is to avoid damage to underground utility lines and to prevent injury to people "from the same general risk at which the statute is obviously directed").

As the judge correctly stated (and the jury could have so found), the purposes underlying Boston Edison's Code 19 and Article 449, and the commission's conditions stamped on Edison's 1986 installation plan are to provide for the *safe* and efficient installation, repair, and maintenance of underground utility lines and ducts, particularly where, by necessity, these service lines must share limited space in underground trenches beneath congested city streets. Furthermore, Boston Edison's contention that these requirements are intended to protect only construction personnel authorized by the commission or Boston Edison is without merit. As Boston Edison would have it, a Boston Edison-approved contractor

who suffered an injury identical to the plaintiff is protected, while the plaintiff is not. A more reasonable construction of the requirements is that *any* contractor, including Healy and the plaintiff, as its employee, who attempts to install or repair utility or service lines is protected.

Boston Edison further contends that the requirements do not apply in this case because: (a) its own Article 449 provides only for "horizontal separation" of lines (rather than vertical separation, as was the case here); and (b) the commission's regulation applies only to active, in-use lines that appear on current plans. This claim is without merit. It was clear from the record that utility lines are installed side by side as well as above and below each other in confined trench areas. Given these circumstances, it seems illogical that Boston Edison's regulation would apply only to a side by side layout, but not to an installation above another line, particularly where safe and convenient access to a line below another is generally more difficult. As to Boston Edison's second contention — that the commission's condition did not apply because the sewer structure was abandoned — there was evidence from which the jury could determine that the sewer line, in fact, was not abandoned, even though undepicted on recent commission plans. More important, the sewer line was only inches below Boston Edison's line and, thus, could readily have been discovered — and avoided — by Boston Edison's workers.

Given the over-all nature of the risks these requirements seek to prevent, we conclude that there was no error in the judge's instruction to the jury to consider violations of these requirements as evidence of Boston Edison's negligence.

*Judgment affirmed.*

*Order denying motions for judgment notwithstanding the verdict and for a new trial affirmed.*