## MARY KELLIE BEAUPRE *vs.* CLIFF SMITH & ASSOCIATES & another.[1]

No. 98-P-100.

Middlesex. May 5, 2000. - November 16, 2000.

Present: KASS, LAURENCE, & DUFFLY, JJ.

*Employment,* Discrimination, Sexual harassment. *Anti-Discrimination Law,* Termination of employment, Sex, Burden of proof, Individual liability, Damages. *Practice, Civil,* Challenge of jurors, Judicial discretion, Directed verdict, Instructions to jury. *Witness,* Expert. *Damages,* Under anti-discrimination law.

Defendants in a civil action did not preserve for appellate review any issue regarding their peremptory challenges. [482-483]

Defendants in a civil action did not demonstrate that the trial judge's decision mid-trial to allow the plaintiff's treating physician to testify as an expert constituted an abuse of discretion, or, in any event, that any prejudice resulted from the judge's ruling. [483-488]

Evidence at the trial of a claim for sex discrimination in employment in violation of G. L. c. 151B, § 4, was more than sufficient to meet the plaintiff's burden of establishing "quid pro quo" and "hostile work environment" sexual harassment, and there was no error in the judge's submitting the case to the jury or denying the defendants' motions for judgment notwithstanding the verdict. [488-489]

There was no merit to a claim that there is a presumption in the law favoring an accused harasser in a case involving a former consensual sexual relationship between the accuser and the accused. [489]

A claim of sex discrimination in employment was not barred by the six-month statute of limitations set forth in G. L. c. 151B, § 5 [489-490], and the judge properly allowed evidence of related conduct falling outside the six-month period on a theory of a continuing violation [490].

A corporation's president and controlling shareholder was correctly held personally liable, along with the corporation, for his sexual harassment of an employee of the corporation, where there was sufficient evidence of his conduct coercing the plaintiff into submitting to his sexual demands and using his authority over the corporation to create a hostile environment to warrant the jury's verdicts; further, the individual defendant had ample notice of the specific allegations against him. [490-496]

The awards of damages in a claim of sex discrimination in employment,

---

[1]Clifford F. Smith, individually.

consisting of lost front pay and lost back pay, were neither speculative nor excessive [496-497], and the punitive damages award was not, on the record, excessive [497-498].

CIVIL ACTION commenced in the Superior Court Department on April 16, 1993.

The case was tried before *Herman J. Smith, Jr.,* J.

*Raymond J. Reed* for Cliff Smith & Associates.

*Paul M. Stein* for Clifford F. Smith.

*Laura R. Studen (John G. DiPiano* with her) for the plaintiff.

LAURENCE, J. The defendants, Cliff Smith & Associates (CSA)[2] and Clifford F. Smith (CSA's president and controlling shareholder), appeal from verdicts and damage awards by a Superior Court jury in favor of a former employee, the plaintiff, Mary Kellie Beaupre. The plaintiff had commenced suit in April, 1993, on a complaint alleging that her discharge from CSA in September, 1992, was motivated by unlawful sex discrimination in violation of G. L. c. 151B, § 4,[3] in the form of sexual harassment of both the "quid pro quo" and "hostile work environment" varieties (see G. L. c. 151B, § 1[18]; *Ramsdell* v. *Western Mass. Bus Lines, Inc.,* 415 Mass. 673, 677 [1993]; *Meritor Sav. Bank* v. *Vinson,* 477 U.S. 57, 65-66 [1986]).[4] The defendants as-

---

[2]A Massachusetts corporation engaged in the automotive after-market industry.

[3]General Laws c. 151B, § 4(16A), inserted by St. 1986, c. 588, § 3, states that "[i]t shall be an unlawful practice . . . [f]or an employer, personally or through its agents, to sexually harass any employee." The defendants concede that CSA met the statutory definition of an employer. See G. L. c. 151B, § 1(5). The plaintiff's complaint, which had been first filed with the Massachusetts Commission Against Discrimination (MCAD), see G. L. c. 151B, § 9, originally contained five other counts that were either dismissed or have not been made the subject of appeal. She also named as a codefendant Wayne Yodzio, a friend of Smith and major customer of CSA. Yodzio employed the man who became the plaintiff's boyfriend subsequent to Smith (see note 4, *infra*). The plaintiff settled her claims against Yodzio prior to trial, and the complaint against him was dismissed with prejudice by stipulation.

[4]The plaintiff and Smith had entered into an intimate consensual relationship in January, 1989, after the plaintiff had worked at CSA for eight years. She testified that in the spring of 1992 she repeatedly indicated to Smith that she wanted to end their relationship, but to no avail. She then began secretly dating an employee of CSA's major customer. Smith discovered this and, according to the plaintiff, on July 27, 1992, screamed and yelled obscenities at her, crudely interrogated her about her sex life, revoked many of her employ-

sign several errors on appeal: the judge's supposed limitation of their peremptory jury challenges; the judge's allowance at trial of previously undisclosed expert opinion testimony by the plaintiff's treating psychiatrist; the judge's denial of their motions for directed verdict and judgment notwithstanding the verdict (challenging the sufficiency of the plaintiff's sexual harassment case); the verdict of individual liability against Smith; and the excessiveness of the damage awards generally, and the award of punitive damages against Smith individually in particular. We affirm.

1. *Peremptory challenges.* The defendants assert that they were erroneously deprived of four peremptory challenges during jury empanelment.[5] The record, however, does not support their contention. Indeed, they did not properly preserve the is-

ment privileges, and threatened both her job and her future in the automotive after-market industry. The plaintiff claimed that Smith proceeded to subject her to constant verbal harassment, humiliation, and threats of job loss over the next month, both in the office in the presence of coworkers and outside the office, unless she ended her present relationship and resumed her sexual liaison with him. Among other threats he uttered, she alleged, was to have his lawyers make her life miserable and force her into suffering a nervous breakdown unless she returned to him. On September 3, 1992, the plaintiff tendered her resignation, not only because of the stress of Smith's threats and constant harassment but also because he had given her an ultimatum that she would have to resign if she did not return to the sexual relationship with him. He continued to contact her thereafter, demanding a resumption of their relationship and promising her job back if she did. On October 8, 1992, feeling that she had to comply to salvage her career, she spent the night with Smith, but immediately repented of her action and broke it off again. She testified that Smith then angrily terminated severance pay and health insurance coverage which he had earlier promised her. On October 11, 1992, she went to a hospital emergency room with various symptoms (shaking, vomiting, crying, and insomnia) that she feared betokened a nervous breakdown. She was referred to a psychiatrist, Dr. Andrew Compaine, who treated her over the next few years. She testified that Smith's harassment, including telephoned obscenities and threats, continued into early 1993. Smith's version of events, unsurprisingly, differed from the plaintiff's, in denying any harassment or threats on or after July 27, 1992, characterizing their encounters instead as efforts at reconciliation. He emphatically denied conditioning the plaintiff's job on her resuming a sexual relationship with him. He testified that she had voluntarily resigned on September 3, 1992, and that the entire scenario evidenced not sexual harassment, but the unfortunate souring and disintegration of a once-consensual romantic relationship.

[5]General Laws c. 234, § 29, provides that "[i]n a civil case, each party shall be entitled to four peremptory challenges," and where, as in this case, additional jurors are empaneled, "[e]ach side is entitled to 1 [additional] peremptory challenge . . . ." Mass.R.Civ.P. 47(b), 365 Mass. 812 (1974). The

sue for appeal. The record reflects no statement or action by the judge regarding the number of challenges each party was allowed, nor the judge's rejection of any attempted exercise of additional challenges by the defendants, nor any defense objection to any aspect of the jury selection process. For all we know from the record, had either of the defendants wished to challenge additional jurors peremptorily, the judge would have allowed it. Their appellate claim that any further challenges by them would have been futile is entirely speculative. That they essayed no such additional challenges more likely shows that they in fact had none. The record reveals that both CSA and Smith informed the judge that they were content with the jury. Nothing on the record suggests any error or abuse with respect to the "trial judge['s] . . . large degree of discretion in the jury selection process." *Commonwealth* v. *Benjamin,* 430 Mass. 673, 675 (2000).[6]

Moreover, "the denial of the correct number of peremptory challenges [does not] constitute[] by itself ground for reversal . . . ." *Andras* v. *Marcyoniak,* 13 Mass. App. Ct. 1043, 1043 (1982). Neither CSA nor Smith has shown, as they must even if an error in this regard occurred, that "the ruling affected the jury's verdict in some material way." *Id.* at 1044. The lack of the requisite prejudice is seen in the failure of CSA and Smith to demonstrate that either defendant "was required to accept one or more jurors whom he wished to challenge . . . ." *Ibid.,* quoting from *Tamburello* v. *Welch,* 392 S.W.2d 114, 116 (Tex. 1965).

2. *Expert testimony.* The defendants point out that the plaintiff's treating psychiatrist, Dr. Compaine, was not

defendants claim they only exercised five of their combined total of nine available peremptory challenges. The plaintiff exercised four.

[6]Although the defendants did file a motion to correct or modify the record, pursuant to Mass.R.A.P. 8(e), as amended, 378 Mass. 934 (1979), claiming that the transcript did not reflect a sidebar conference in which the judge refused to allow them additional peremptory challenges, the trial judge denied the motion. The judge's discretionary decision in this respect "is conclusive . . . absent a showing that the . . . court has intentionally falsified the record." *Burda* v. *Spencer,* 28 Mass. App. Ct. 685, 689 (1990), quoting from *Letch* v. *Daniels,* 401 Mass. 65, 67-68 n.3 (1987). No such showing was attempted here. Indeed, the defendants concede that there is "[n]o clear precedent for redress [from such a ruling]." Even if the record were modified as the defendants wished, our result would be unchanged because, as discussed in the following paragraph, the defendants have failed to show the requisite prejudice.

designated an expert during discovery or at any other time prior to trial. In the parties' joint pretrial memorandum, the plaintiff affirmatively represented that she had no expert witnesses. On the seventh day of trial, however, the judge allowed the plaintiff to question Dr. Compaine both as an expert and as her treating physician, over the defendants' objection that the plaintiff had not previously identified him as an expert. Dr. Compaine went on to testify not only to his diagnosis and treatment of the emotional and physical problems that the plaintiff had presented in the wake of her leaving CSA, but also to the general characteristics displayed by persons in abusive relationships, including lack of free will. He opined, based on what the plaintiff had told him and the symptoms she manifested, that she appeared to lack free will in the context of an abusive relationship. This, the defendants contend on appeal, constituted prejudicial surprise.[7]

We are not unsympathetic to the defendants' indignation at the plaintiff's cavalier violation of the procedural rules with respect to her expert.[8] The defendants' appeal nonetheless falters in not coming to grips with either the applicable standards of

[7]The judge allowed Dr. Compaine's testimony after hearing argument from the defendants complaining only of the plaintiff's failure to have identified him as an expert. They contended that they took Compaine's deposition based upon their "assumption" that he would not be testifying as an expert, that they did not probe his opinions at the deposition, and that they were, therefore, not prepared to cross-examine him about his opinions at trial. The defendants have not included the deposition transcript in the record appendix. For her part, the plaintiff countered to the judge that the defendants had in fact been treating Compaine as an expert "all along," including at his deposition, and had long possessed all of his notes regarding the plaintiff. The judge ruled that Compaine could testify as both "a treating physician and as an expert," stating that "I don't think there is any prejudice." The defendants did not proffer a demonstration of any specific prejudice in response to the judge's ruling.

[8]We find particularly distressing the plaintiff's view of her obligation to supplement inaccurate interrogatory answers. Original codefendant Yodzio (see note 3, *supra*) served interrogatories on the plaintiff prior to his dismissal, to which the plaintiff responded that no expert witness had been identified, while recognizing her obligation to supplement. She argues (without citation to authority) that she had no obligation to CSA and Smith to supplement because they failed to serve their own interrogatories on her. This contention ignores the mandate that the rules of civil procedure are instruments for the promotion of justice (Mass.R.Civ.P. 1, as amended, 423 Mass. 1404 [1996]), not the exaltation of mere technicalities. Cf. *O'Connor* v. *City Manager of Medford*, 7 Mass. App. Ct. 615, 619 (1979); *Foman* v. *Davis*, 371 U.S. 178, 182 (1962). It also overlooks the fact that interrogatory answers constitute admissions of a party opponent (though not conclusively binding admissions,

review or their failure to discharge the basic obligation of litigants seeking appellate relief to make and preserve proper objections at trial.

The extensive discretion of trial judges with respect to both the process of discovery and the admission of evidence, particularly expert testimony,[9] and the great deference appellate courts accord the rulings of trial judges in these areas are too well established to require citation. The defendants have not demonstrated that the judge's decision to allow Dr. Compaine to testify as an expert in mid-trial constituted an abuse of that broad discretion; or that, even if the judge erred in his exercise of discretion in these matters, prejudicial error ensued. See *Commonwealth* v. *Francis*, 390 Mass. 89, 99 & n.6 (1983); *Commonwealth* v. *Medeiros*, 395 Mass. 336, 351 (1985); *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 799 (1987).[10]

The defendants have cited to, and we know of, no case in which a trial judge's discretionary admission (or exclusion) of belatedly offered and previously unidentified expert testimony has been reversed by our appellate courts, notwithstanding any violation of discovery obligations or pretrial orders. Moreover, it is clear that they knew well prior to trial that Dr. Compaine would be the plaintiff's key witness. They had subpoenaed all his treatment notes and they had deposed him, thereby having had the opportunity to obtain the substance of his testimony.[11] We conclude that "[a]bsent here [was] the sort of unfair surprise

G. L. c. 231, § 89) which are available for evidentiary use by any adverse party to the litigation. Cf. *Flood* v. *Southland Corp.*, 416 Mass. 62, 71 (1993).

[9]This breadth of discretion extends to medical diagnosis and causation opinions. *Canavan's Case*, 432 Mass. 304, 311-312 (2000). Unlike *Canavan's Case*, this case does not involve a challenge to a medical opinion that lacks a basis in reliable scientific methodology.

[10]An objecting party's burden to show an abuse of discretion regarding the admission of even seriously prejudicial relevant evidence is "a heavy one" which can be sustained only by a showing that "no conscientious judge, acting intelligently, could have taken the view expressed by him." *Commonwealth* v. *Medeiros*, 395 Mass. at 351, quoting from *Commonwealth* v. *Bys*, 370 Mass. 350, 361 (1976). On this record (see discussion, *infra*), the judge's admission of the expert testimony on the ground that it was not prejudicial to the defendants has not been shown to fall into that narrow category.

[11]The defendants' contention at oral argument that Dr. Compaine's deposition did not reveal any of his expert opinions cannot be verified because of their failure to make the transcript of that deposition part of the record on appeal (see note 7, *supra*). See Mass.R.A.P. 8(b), 378 Mass. 932 (1979); Mass. R.A.P. 18(a), 378 Mass. 940 (1979); Mass.R.A.P. 18(b), as amended, 417 Mass. 1602 (1994). Cf. Mass.R.Civ.P. 5(d)(2), as amended, 404 Mass. 1402

which [the discovery rules] seek[] to prevent." *Resendes* v. *Boston Edison Co.*, 38 Mass. App. Ct. 344, 351 (1995).

Further subversive of their claim of unfair surprise or prejudice are the facts that the defendants (a) did not request a continuance, thereby indicating that there was nothing further to investigate regarding Dr. Compaine, that they were prepared to cross-examine him, and that their own expert was ready to counter opinions favorable to the plaintiff's case, see *Giannaros* v. *M.S. Walker, Inc.*, 16 Mass. App. Ct. 902, 902 (1983); *Resendes* v. *Boston Edison Co.*, 38 Mass. App. Ct. at 350-351 (failure of defendant to seek continuance when plaintiff's late-identified expert allowed to testify cuts against claim of abuse of discretion and prejudice); cf. *Commonwealth* v. *Gordon*, 422 Mass. 816, 836 (1996), quoting from *Commonwealth* v. *Mc-Gann*, 20 Mass. App. Ct. 59, 66 (1985) (when "surprise" evidence surfaces at trial in violation of discovery obligations, "the preferred course of action is . . . a provision of additional time . . . ."); (b) did not seek a voir dire on or challenge Dr. Compaine's qualifications to provide expert testimony (and have likewise not challenged the judge's implicit discretionary finding that Dr. Compaine was so qualified, a finding amply supported by his resume and experience, see *Commonwealth* v. *Boyd*, 367 Mass. 169, 182 [1975], and cases cited); (c) did not state any specific objection to the content of the opinions Dr. Compaine expressed or to his testifying as both the treating physician and an expert (indeed, defense counsel conceded that a treating physician may render an expert opinion so long as he

(1989) ("The party taking a deposition . . . is responsible for its preservation and delivery to court if needed . . ."). We are dubious of this contention, in light of the defendants' representation with respect to their own identified expert witness, Dr. Thomas Gutheil, contained in the joint pretrial memorandum, that "Dr. Gutheil may also be expected to rebut testimony proffered by mental health experts called by the plaintiff and to impeach the credibility of *opinions* offered by the plaintiff's treating mental health care providers" (emphasis added). That, along with the pretrial description of Dr. Gutheil's own substantive opinions, plainly indicates — as it presumably did to the trial judge — that the defendants expected and were prepared to counter any testimony the plaintiff might elicit from Dr. Compaine on the issue of the impact the defendants' conduct had on the plaintiff's health. "We must assume [defense] counsel was prepared to cross-examine all opposing expert medical witnesses on the expectation that they would testify consistent with the theory of [the plaintiff's] case." *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. at 799, quoting from *Schneider* v. *Lockheed Aircraft Corp.*, 658 F.2d 835, 848 n.8 (D.C. Cir. 1981), cert. denied, 455 U.S. 994 (1982).

is qualified to do so and there is a proper foundation for the opinion); and (d) did at no time articulate any objection to Dr. Compaine's testimony beyond the lack of prior notification.[12]

Assuming, arguendo, that Dr. Compaine should not have been allowed to testify as an expert, the defendants have not demonstrated any consequent prejudice. Their ability to cross-examine him thoroughly was not discernibly hindered. In particular, they effectively used his treatment notes and admissions to emphasize for the jury that he had no personal knowledge of the events at CSA that the plaintiff reported to him and that he based his opinions on the information supplied by the plaintiff. They responded to every significant aspect of Compaine's testimony through their own expert, Dr. Gutheil, who had personally interviewed both the plaintiff and Smith. Gutheil not only contradicted Compaine's opinion that the plaintiff presented the clinical picture of someone in an abusive relationship who had lost her free will, but further opined (well beyond the testimony of Compaine, see note 12, *supra*) that the facts of the case were "most consistent with a broken-up office romance . . . rather than a gender-based sexual harassment scenario" (an opinion not challenged by the plaintiff). There was also no undue emphasis by plaintiff's counsel in closing argument on Dr. Compaine's testimony. The judge's charge on the subject of expert testimony was additionally counteractive of any residue of prejudice.[13]

In sum, we discern neither abuse of discretion nor improper

---

[12]On appeal, the defendants for the first time argue that Dr. Compaine's opinions had no proper foundation in the evidence, that his testimony went beyond the realm of permissible expert opinion by touching on the ultimate issue for the jury, and that it constituted an impermissible "blending" in a single witness of factual treatment and scientific opinion testimony. Their contentions, not raised below, can find no success here. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471 & n.25 (1991); *West Broadway Task Force* v. *Boston Hous. Authy.*, 414 Mass. 394, 397 n.2 (1993); *Vassallo* v. *Baxter Healthcare Corp.*, 428 Mass. 1, 11 (1998); *Thibeault* v. *Massachusetts Elec. Co.*, 2 Mass. App. Ct. 24, 28 (1974); *Citgo Petroleum Corp.* v. *Planning Bd. of Braintree*, 24 Mass. App. Ct. 425, 426 n.2 (1987); *Handrahan* v. *Red Roof Inns, Inc.*, 43 Mass. App. Ct. 13, 21-22 (1997). We note, in passing, that Dr. Compaine did not in fact give testimony regarding the ultimate issue for the jury, whether Smith's conduct amounted to sexual harassment.

[13]The judge instructed the jury that they were not bound by the opinion of any expert, that the opinion of an expert need not be given any more weight than the testimony of any lay witness, that the jury could and should carefully assess the respective experts' credibility and reject whatever expert opinions they thought were based on insufficient qualifications or were

prejudice to the defendants by virtue of the judge's allowance of the plaintiff's expert testimony. See *Eagan* v. *Marr Scaffolding Co.*, 14 Mass. App. Ct. 1036, 1036 (1982) ("[i]t was within the discretion of the trial judge to permit substitute expert witnesses to testify on the plaintiff's behalf even though supplementation of [discovery] . . . did not occur until shortly before and during trial, where [the] defendant long had notice of the substance of the testimony expected, where [the] defendant had an opportunity to — and did — depose each witness . . . , and where no bad faith was shown on the part of the plaintiff"). Cf. *Resendes* v. *Boston Edison Co.*, 38 Mass. App. Ct. at 350-351, and cases cited.

3. *Denial of directed verdict motion.* Under the standard of review applicable to the denial of the defendants' motion for a directed verdict on the G. L. c. 151B claim, the defendants' contention that the evidence did not establish actionable sexual harassment fails.[14]

The plaintiff's testimony (see note 4, *supra*), if believed by the jury, would be more than sufficient to meet her burden of establishing both sets of circumstances constituting what are commonly known as "quid pro quo" and "hostile work environment" sexual harassment (see G. L. c. 151B, § 1[18][*a*], [*b*]), namely that (a) Smith's sexual advances and other sexual conduct directed at the plaintiff were unwelcome, cf. *Gnerre* v. *Massachusetts Commn. Against Discrimination*, 402 Mass. 502, 507 (1988); and (b) the advances either conditioned some aspect of employment or were sufficiently pervasive that they "ha[d] the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment."

---

otherwise unsound, and that if an expert witness answered a hypothetical question, all the assumed facts in the hypothetical had to be facts in evidence or the jury could not accept that opinion. Additionally, the defendants requested and received an instruction on the limited evidentiary value of statements made by the plaintiff to Dr. Compaine for the purpose of diagnosis and treatment. See *Simon* v. *Solomon*, 385 Mass. 91, 104-106 & n.8 (1982).

[14]"[T]he question before us [in reviewing such a ruling] is . . . whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff[].' " *Rolanti* v. *Boston Edison Corp.*, 33 Mass. App. Ct. 516, 520 (1992), quoting from *Dobos* v. *Driscoll*, 404 Mass. 634, 656 (1989). The same standard applies to review of the denial of the defendants' motion for judgment notwithstanding the verdict. See *Forlano* v. *Hughes*, 393 Mass. 502, 504 (1984).

G. L. c. 151B, § 1(18)(*b*). See *Ramsdell* v. *Western Mass. Bus Lines, Inc.*, 415 Mass. 673, 678-679 (1993).

The defendants, who did not request that the special questions submitted to the jury provide that the jury specify the theory of sexual harassment supporting any verdict, may not now be heard to argue, as they do, that it is impossible to tell on which theory the jury based their verdict. See Mass.R.Civ.P. 49(a), 365 Mass. 813 (1974); *Hawco* v. *Massachusetts Bay Transp. Authy.*, 398 Mass. 1006, 1006 (1986); *Rolanti* v. *Boston Edison Corp.*, 33 Mass. App. Ct. 516, 530 (1992). There being adequate evidence to support a verdict on both theories, the judge did not err in sending the case to the jury and in not overturning the jury's verdicts.

Also unavailing is the defendants' suggestion that the judge erred in not instructing the jury (as they requested) that a special presumption favoring accused harassers applies to sexual harassment cases involving coworkers who once shared a consensual sexual relationship. Such a presumption finds no support in the law of this Commonwealth. We are not obligated to follow the Federal courts' interpretations of related, but distinguishable, portions of Title VII which suggest such a presumption — see, e.g., *College-Town, Div. of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination*, 400 Mass. 156, 163-164 (1987); *Melnychenko* v. *84 Lumber Co.*, 424 Mass. 285, 289 (1997); *Bain* v. *Springfield*, 424 Mass. 758, 765 n.4 (1997); *Mullenix* v. *Forsyth Dental Infirmary for Children*, 965 F. Supp. 120, 153 (D. Mass. 1996) — and none of the cases cited by the defendants involved the relevant provisions of chapter 151B.[15]

Finally, the defendants contend that the plaintiff's January 29,

---

[15]The judge's instructions in fact emphasized that the plaintiff and Smith had once shared a consensual sexual relationship and that, therefore, the case required "special scrutiny" by the jury. The judge went on to give essentially the instruction requested by the defendants on this issue, except that he did not adopt the "presumption" they urged. The judge twice drew the distinction between conduct motivated by an unlawful gender bias and conduct lawfully stemming from a failed romantic relationship. Cases decided by the MCAD, the agency charged with interpreting chapter 151B and to whose interpretations we defer (see *College-Town, Div. of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination*, 400 Mass. at 166; *Chapin* v. *University of Mass. at Lowell*, 977 F. Supp. 72, 78 [D. Mass. 1997]), reject the presumption urged by the defendants. "Voluntary" participation in acts that constitute sexual harassment of either variety does not necessarily bar recovery under chapter 151B. See, e.g., *Durante* v. *Eastern Properties, Inc.*, 18 M.D.L.R. 1, 4 (1996); *Lawless* v. *Northeast Battery & Alternator, Inc.*, 22 M.D.L.R. 138,

1993, complaint with the MCAD was filed over six months after the ugly July 27, 1992, incident between the plaintiff and Smith (see G. L. c. 151B, § 5, creating a six-month statute of limitations), and that the judge consequently erred in not instructing the jury to ignore that outside-the-statute incident, which they assert was unduly "played up" in the plaintiff's closing argument. The evidence (of Smith's constant sexual harassment of the plaintiff during August and into October, 1992, and his offers during that same time period of restoration of employment perquisites and of reemployment explicitly conditioned upon resumption of a sexual relationship, see note 4, *supra*) eliminated any statute of limitations problem by providing sufficient independent bases for the jury's verdicts.

The judge also acted within his discretion in allowing the admission of evidence of related conduct falling outside of the six-month period on a "continuing violation" theory, which he implicitly did in denying the defendants' directed verdict motion that was in part premised on the irrelevance of the July 27, 1992, flare-up. See, e.g., *Lynn Teachers Union, Local 1037* v. *Massachusetts Commn. Against Discrimination*, 406 Mass. 515, 520-523 (1990); *In re C.F. Smith & Assocs., Inc.*, 235 B.R. 153, 164 (Bankr. D. Mass. 1999).

4. *Smith's individual liability.* The defendants argue that no Massachusetts appellate decision has recognized personal liability of individual employees under G. L. c. 151B; that the "trend of authority" in other states and under analogous Federal law is to construe sexual harassment statutes so as "to limit liability to an 'employer' "; that in any event Smith himself could only be held personally liable in this case for "aiding and abetting" CSA under G. L. c. 151B, § 4(5), but he was never charged individually or as an aider or abettor in the MCAD charge or the Superior Court complaint; and that such liability would be legally impossible since the only sexually harassing conduct alleged was his own, i.e., "there was no one else whom he could have aided and abetted." These arguments all fail, for several reasons.

First, G. L. c. 151B does not limit the categories of persons

142-143 (2000). Cf. *Meritor Sav. Bank* v. *Vinson*, 477 U.S. 57, 68 (1986) (in Title VII sexual harassment claim, "correct inquiry is whether [complainant] by her conduct indicated that the alleged sexual advances were unwelcome, *not* whether her actual participation in sexual intercourse was voluntary") (emphasis added).

who may be individually liable. To the contrary, the plain language of the statute provides on its face for individual personal liability in several sections,[16] unlike the cognate provisions of other jurisdictions (including Federal), which are more or less ambiguous on the issue. See *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992) ("[W]hen a statute speaks with clarity to an issue[,] judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished").[17] The MCAD, whose interpretations of G. L. c. 151B we are to accord deference, *College-Town, Div. of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination*, 400 Mass. at 166, has long recognized and imposed individual liability under the statute, including in situations similar to this one.[18]

---

[16]Those sections are § 4(1), the general prohibition against employment discrimination by an individual employer "because of . . . sex," sexual harassment being a form of sex discrimination, G. L. c. 151B, § 1(18); § 4(4), making it unlawful for any person to discharge, expel or otherwise discriminate against any person because he "has opposed any practices forbidden under this chapter"; § 4(4A), making it unlawful for any person to "coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter," one such right being freedom from sexual harassment, G. L. c. 214, § 1C, and G. L. c. 151B, §§ 1(18), 4; § 4(5), making it unlawful for any person "to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter"; and § 4(16A), making it unlawful for an individual employer "to sexually harass any employee."

[17]For the varying Federal views on individual liability in employment discrimination cases under Federal Title VII, see the discussion in *Ruffino* v. *State St. Bank & Trust Co.*, 908 F. Supp. 1019, 1047-1048 (D. Mass. 1995).

[18]The most notable MCAD decisions in this respect are *Hope* v. *San-Ran, Inc.*, 8 M.D.L.R. 1195, 1210-1211 (1986) (supervisor who perpetrated sexual harassment of terminated employee and manager who did not act on employee's complaint held jointly and severally liable for their separate acts of aiding and abetting the vicariously liable corporate employer's illegal discrimination); *Harmon* v. *Malden Hosp.*, 19 M.D.L.R. 157, 157-158 (1997) (opining that individuals who actively perpetrate or assist in the acts forbidden by §§ 4[4], 4[4A], and 4[5] can be held separately liable as aiders and abettors of the vicariously liable corporate employer deemed responsible for the discrimination against the employee under standard concepts of "accessory liability"); *Rafferty* v. *Keyland Corp.*, 22 M.D.L.R. 125, 127 (2000) (president and owner of the employer corporation who made such persistent verbal and physical sexual overtures to employee that she was finally compelled to quit her job held personally liable for hostile work environment sexual harassment along with the vicariously liable corporation); and *Tunstall* v. *Acticell H'W Cosmetics*, 22 M.D.L.R. 284, 287-289 (2000) (corporation's president and

Highly pertinent in this regard are the mandate of G. L. c. 151B, § 9, that the provisions of the chapter must be construed liberally for the accomplishment of its purposes — one of which was to discourage and penalize discriminatory conduct, including sexual harassment, by individuals — and the explicitly declared policy of the Commonwealth that all persons have the right to be free from sexual harassment. G. L. c. 214, § 1C. Given these authorities, we have no hesitation in stating that our law clearly rejects the defendants' contention that Smith cannot be held individually liable under c. 151B for his active sexual harassment of the plaintiff.[19]

Contrary to the defendants' assertion, Smith was from the outset named as an individual defendant and alleged to have had personal responsibility for the plaintiff's claimed sexual harassment and consequent injuries, in both the MCAD charge and the Superior Court complaint. He had ample notice of the specific allegations made against him personally by the plaintiff. See *Brunson* v. *Wall*, 405 Mass. 446, 451 (1989); *Lattimore* v. *Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir. 1996); *Chatman* v. *Gentle Dental Center of Waltham*, 973 F. Supp. 228, 235 (D. Mass. 1997) (together emphasizing the importance under c. 151B of sufficient notice being provided in the MCAD filing of the charges being made and of the parties deemed responsible, so as to allow both the opportunity to attempt early conciliation and a fair opportunity to litigate the issues raised).

The judge's special question form expressly requested verdicts by the jury as to Smith's personal liability for sexual harassment of the plaintiff (without specifying the legal bases or theory therefor) as well as the liability of CSA. The form also required the jury to determine whether punitive damages should be awarded against Smith personally as well as against CSA. The defendants did not register timely objections to either the

owner who made unwelcome sexual advances to which employee submitted because of explicit threat of losing her job otherwise deemed individually liable for both quid pro quo and hostile environment sexual harassment, even where the corporation was not liable).

[19] A similar conclusion has been reached by Federal decisions in the District of Massachusetts construing c. 151B. See *Ruffino* v. *State St. Bank & Trust Co.*, 908 F. Supp. at 1048; *Chatman* v. *Gentle Dental Center of Waltham*, 973 F. Supp. 228, 232 n.8 (D. Mass. 1997); *Chapin* v. *University of Mass. at Lowell*, 977 F. Supp. 72, 80 (D. Mass. 1997); *Morehouse* v. *Berkshire Gas Co.*, 989 F. Supp. 54, 61 (D. Mass. 1997); *Meara* v. *Bennett*, 27 F. Supp. 2d 288, 291 (D. Mass. 1998).

form of the special questions or the accompanying instructions before the jury retired for deliberation and have accordingly waived the right to challenge those matters. See discussion of Mass.R.Civ.P. 49(a), *supra* at 489.[20]

Even if we view the legal source for Smith's liability to be limited to the strictures of G. L. c. 151B, § 4(5),[21] we have no difficulty in concluding that a sufficient basis existed in the

[20]In the memorandum of law supporting their motion for a directed verdict, the defendants argued that the c. 151B claim against Smith should be dismissed because the plaintiff had never asserted that he was an aider and abettor, although she had explicitly described all the sexually harassing conduct and claimed that it had been performed solely by Smith and had always sought recovery against him individually as well as against CSA. After the denial of that motion (which was well within the judge's discretion with respect to the aiding and abetting issue, see Mass.R.Civ.P. 15[b], 365 Mass. 761 [1974]; *Jacobs* v. *Yamaha Motor Corp., U.S.A.*, 420 Mass. 323, 332 [1995]; *Republic Floors of New England, Inc.* v. *Weston Racquet Club, Inc.*, 25 Mass. App. Ct. 479, 487-488 & n.11 [1988], particularly in the absence of any plausible claim by the defendants of prejudicial surprise), the defendants did not preserve the issue by appropriate requests and objections regarding the special questions and the judge's instructions thereon prior to the jury commencing their deliberations.

[21]As noted (*supra* at 489), the special questions and the judge's instructions did not specify or limit the particular provisions of c. 151B that the defendants could have been found to have violated. Smith's sexual harassment of the plaintiff (assuming that the jury credited her version of the facts) arguably fell within the personal liability provisions of G. L. c. 151B, § 4(4) (by effecting her discharge because of her expressed opposition to his sexual harassment, a form of sex discrimination), as well as those of § 4(4A) (by threatening, coercing, and interfering with her right, protected by G. L. c. 151B and c. 214, § 1C, to be free from sexual harassment in employment). During deliberations the jury asked for a copy of c. 151B. At first the judge indicated he would provide the entire chapter, but subsequently decided to give them only § 1(18) (defining "sexual harassment") and § 4(5) (making it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so"). He then told the jury that "[t]hose are the only portions of the statute that are pertinent to this case and that you should consider." The defendants objected to the jury being furnished a copy of § 4(5), on the erroneous premise that the complaint and the statute did not encompass personal liability and that the evidence against Smith was in any event insufficient to constitute actionable sexual harassment. They have not pressed that point on appeal; but it would have done them no good to do so, since they failed to object to the judge's subsequent instructions on the statute (which were more favorable to them than the plaintiff's evidence warranted), and the judge's action appears within his discretion. Compare *Ross* v. *Broitman*, 338 Mass. 770, 774-775 (1959); *Schofield* v. *Small*, 348 Mass. 782, 782 (1965). Contrast *Merrill* v. *Nary*, 10 Allen 416, 418-419 (1865) (trial judge's unilaterally providing

evidence for the jury verdict. The defendants' argument rests on the erroneous implied premise that the existence of the corporate employer, CSA, can be ignored; that CSA, therefore, cannot be deemed an independent actor for purposes of aiding and abetting; and that Smith, the only actor charged with sexually harassing behavior, cannot rationally be held liable for aiding and abetting himself. This contention is unsupported by any relevant authority or any effort to establish that CSA is the mere alter ego of Smith so that its corporate separateness can be disregarded. It is also legally and conceptually incorrect.

CSA is a viable legal person[22] separate and distinct from its shareholders, officers and employees, possessing virtually all of the legal attributes of a natural person. See *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 618-619 (1968). Most pertinently, it has the capacity to make employment contracts and to sue and be sued, see G. L. c. 156B, § 9(*b*), (*h*), and to be held both civilly and criminally responsible (including as an aider and abettor) for actionable wrongs committed by its responsible officers. See *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 249-250, 253-255, 270-271, 276-281 (1971), cert. denied, 407 U.S. 914 (1972); *Kyte* v. *Philip Morris Inc.*, 408 Mass. 162, 166-169 (1990); Model Penal Code and Commentaries § 2.07(1)(a), (1)(c), (4)(c) and comments (1980). CSA and Smith are, in the eyes of the law and the circumstances of this case, two distinct actors.

There is no legal or logical reason why Smith cannot be

---

jury with an entire volume of the General Statutes during their deliberations held reversible error, since the jury might well have read or referred to portions thereof that went beyond the principles of law contained in the judge's charge).

[22]Although the personality of a corporation is sometimes referred to as a "corporate fiction," see, e.g., *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 620 (1968) — with an unfortunate connotation of artificiality regarding a meaningful relationship among human beings that is no more apt than a description of the entities known as the city of Boston or the United States as fictions — our law has nonetheless long recognized the corporation as "a single and separate legal being . . . 'a separate legal entity.' " *Gardiner* v. *Treasurer & Recr. Gen.*, 225 Mass. 355, 370 (1916), quoting from *Peterson* v. *Chicago, Rock Island & Pac. Ry.*, 205 U.S. 364, 392 (1907). See *Marsch* v. *Southern New England R.R. Corp.*, 230 Mass. 483, 498 (1918); *Berry* v. *Old S. Engraving Co.*, 283 Mass. 441, 451 (1933); *Hale* v. *Henkel*, 201 U.S. 43, 76 (1906); 1 Pollock & Maitland, The History of English Law 486-489 (2d ed. 1899); Raymond, The Genesis of the Corporation, 19 Harv. L. Rev. 350, 362-365 (1906).

found liable for aiding and abetting CSA — which, after all, was the plaintiff's actual employer, not Smith — in both his separate acts of sexual harassment against her (which CSA is deemed vicariously to have authorized Smith to do) and in causing CSA to sanction first her demotion, then her constructive discharge, and finally the revocation of her promised benefits.[23] Such a result is entirely consistent with traditional principles of accessorial liability reflected in the authorities cited in the immediately preceding paragraph and is recognized in the MCAD decisions cited in note 18, *supra.* Compare Model Penal Code and Commentaries § 2.06(2)(c), (3)(a) and comments 5-6; § 2.07(6)(a) and comment 7 (1980) (which makes a person "legally accountable for any conduct he performs or causes to be performed in the name of the corporation . . . or in its behalf to the same extent as if it were performed in his own name or behalf" and "makes certain that the corporate agent will not escape liability because all or part of his conduct is performed through or in the name of the corporation").[24]

The defendants' focus on the aiding and abetting provision of § 4(5) is, moreover, unduly narrow. When instructing the jury that they were to confine their liability deliberations to whether Smith's alleged conduct amounted to sexual harassment as defined in c. 151B, § 1(18), and, if so, whether that conduct fell within § 4(5), the judge did not confine their consideration of Smith's personal liability to whether his conduct constituted aiding and abetting. On the plaintiff's evidence and the language of § 4(5), the jury could rationally have found that Smith had both "coerce[d] the doing of . . . acts forbidden under this chapter" — i.e., had coerced the plaintiff into abandoning her right to be free from sexual harassment and into submitting to

---

[23]Smith must also be found to have had the requisite intent to discriminate in order to be liable for aiding and abetting, as the judge correctly instructed, cf. *Planned Parenthood League of Mass., Inc.* v. *Blake,* 417 Mass. 467, 481 (1994); but he has not raised the point on appeal, and the record reflects more than sufficient evidence to support the verdict in that respect.

[24]We note the anomaly that Smith proposes in urging his nonliability. If nonharassing supervisory corporate employees can be held, as they have uniformly been, individually liable under the aiding and abetting provision for failing to report or remedy, or for acquiescing in, sexual harassment by other employees, see *Chapin* v. *University of Mass. at Lowell,* 977 F. Supp. 72, 78-80 (D. Mass. 1997), and authorities cited, as well as the MCAD decisions cited in note 18, *supra,* it would be illogical as well as contrary to the command of G. L. c. 151B, § 9, to allow the actual perpetrating harasser to escape liability.

his sexual demands as a condition of preserving her employment and her career — and "compel[led] . . . the doing of" such acts — i.e., caused them to occur, by personally creating a hostile work environment and making quid pro quo offers while pressuring the plaintiff to resume a sexual relationship and by using his authority over the corporation to eliminate her employment perquisites, to force her resignation, and to terminate her promised severance benefits.

5. *Damages*. The defendants challenge the jury's damage awards of lost front pay ($50,000) and lost back pay ($112,500)[25] as speculative and attack the award of punitive damages against Smith individually as excessive. We have reviewed those contentions in light of the trial evidence and the instructions and conclude that they lack merit.[26] We therefore address them only briefly.

a. *Back pay*. The plaintiff testified that she was earning $45,000 annually at CSA in 1992, the year of her termination. In the four years that elapsed between then and the trial, the plaintiff, at the same salary, would have earned $180,000. According to the plaintiff's testimony, she actually earned approximately $138,000 in that time period. The difference between these amounts would allow for a back pay award of $42,000, only about a third of the jury's actual award. The plaintiff also testified, however, that her CSA salary had

[25]Lost "front pay" is the amount of the plaintiff's future loss of income and benefits, subject to a present value discount, based on the differential between what she was earning at CSA and what she is likely to earn in the future. Lost "back pay" is the additional amount she would have earned from the time of her wrongful separation from CSA to the time of trial, less any amounts she actually earned during that period pursuant to her duty to mitigate. See generally *Conway* v. *Electro Switch Corp.*, 402 Mass. 385 (1988); *Handrahan* v. *Red Roof Inns, Inc.*, 48 Mass. App. Ct. 901 (1999). The judge's instructions as to both back and front pay were correct.

[26]Essentially, the defendants have failed to meet their burden of showing that allowing the damage awards to stand was an abuse of discretion on the part of the judge amounting to an error of law, i.e., that the damages awarded were greatly disproportionate to the injury proven or represented a miscarriage of justice. See *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 824 (1997); *Kolb* v. *Goldring, Inc.*, 694 F.2d 869, 871 (1st Cir. 1982), quoting from *Glazer* v. *Glazer*, 374 F.2d 390, 413 (5th Cir.), cert. denied, 389 U.S. 831 (1967) (we do not disturb a jury's award of damages unless it "exceed[s] any rational appraisal or estimate" of what the damages should be). The defendants erroneously assert that the judge failed to give their requested instruction that the jury may not base a damage award on pure speculation; in fact, he gave that very instruction.

increased by $5,000 every year between 1989 and 1992, during which period she received constant advancement and displayed excellent work performance. Thus, the jury could reasonably factor in such an increase without resorting to speculation. Accounting for raises, the plaintiff could on her evidence have earned between $230,000 and $240,000 between September of 1992 and November of 1996. The difference between that sum and what the plaintiff actually earned during the same time period would support a back pay award of between $92,000 and $102,000. The jury's award of $112,500 was not grossly disproportionate to that amount and is significantly less than what the plaintiff requested ($132,000, which illustrates that the jury did their own calculations and did not blindly adopt the plaintiff's numbers). The award also appears to have accounted for mitigation, as the judge instructed.

b. *Front pay.* Chapter 151B "authorizes an award of damages for loss of future earnings and benefits which have been proved with reasonable certainty as attributable to the employer's misconduct subject to the employee's duty to mitigate." *Conway* v. *Electro Switch Corp.*, 402 Mass. at 390. The plaintiff testified that, at the time of trial, she was employed at a salary of $30,000. Had she remained at CSA, she would (on her evidence) have been earning anywhere from $45,000 to $65,000 annually. The jury's front pay award of $50,000 constituted about two times the difference between her then-current salary and her putative likely salary at CSA. The jury's award, in light of the judge's instructions, appears to have reflected the jury's view that it would have taken the plaintiff about two years to earn what she would have been earning at CSA at either her present job or some other job. That view seems rational, given the fact that, in the four years after her termination, the plaintiff was still earning substantially less than she had when she left CSA. The front pay award was therefore neither speculative or excessive. Contrast *Handrahan* v. *Red Roof Inns, Inc.*, 43 Mass. App. Ct. 13, 24 (1997) (front pay award based on thirty-year future wage period deemed speculative and excessive).

c. *Punitive damages.* The $87,500 punitive damages award against Smith individually was not excessive on this record. See *Bain* v. *Springfield*, 424 Mass. 758, 769 (1997) (punitive damages "award of $100,000, even in the absence of any compensatory harm, would [not] necessarily exceed the norms of rationality"). Contrast *McMillan* v. *Massachusetts Soc. for the*

*Prevention of Cruelty to Animals,* 140 F.3d 288, 306-307 (1st
Cir. 1998), cert. denied, 525 U.S. 1104 (1999) (punitive dam-
ages award of $135,662.50 deemed excessive because evidence
failed to show that the defendant's conduct toward the plaintiff,
while intentional, was so egregious and outrageous as to war-
rant condemnation and deterrence).[27] As required by the authori-
ties, see *Bain* v. *Springfield,* 424 Mass. at 767; *Dartt* v.
*Browning-Ferris Indus., Inc. (Mass.),* 427 Mass. 1, 17-17a
(1998); *Abramian* v. *President & Fellows of Harvard College,*
432 Mass. 107, 119 (2000); *McMillan* v. *Massachusetts Soc. for
the Prevention of Cruelty to Animals,* 140 F.3d at 306-307, the
evidence of Smith's behavior toward the plaintiff could easily
be viewed by a rational jury as not merely intentional and of-
fensive, but an outrageous affront to an individual's personal
dignity that was both recklessly indifferent to the plaintiff's
rights and egregiously beyond the pale of what our society
tolerates in the work place.[28] Having been properly instructed
on the issue, the jury proceeded to assess punitive damages
against Smith (though, notably, not against CSA); and in light
of the evidence, "we do not substitute our judgment for that of
the jury . . . ." *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.),*
427 Mass. at 17a.

*Conclusion.* For the reasons stated above, we affirm the
verdicts and judgments in all respects.[29]

*So ordered.*

---

[27]The defendants have made no contention that the acts complained of by
the plaintiff were not committed with knowledge, or reason to know that they
violated the statute, an element of liability which G. L. c. 151B, § 9, requires.
They do equivocally argue that the judge erred in instructing the jury with
respect to punitive damages. They admit, however, that the judge "did hew, in
general, to the developing law," and at trial their only objection was to the
fact that the judge refused to instruct that the jury were limited to considering
Smith's present net worth in any assessment of damages against him. We
think the judge's instructions easily pass muster under the most recent deci-
sions clarifying the standards for awarding punitive damages. See *Bain* v.
*Springfield,* 424 Mass. at 767; *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.),*
427 Mass. 1, 17-17a (1998); *Abramian* v. *President & Fellows of Harvard
College,* 432 Mass. 107, 119 (2000).

[28]Compare *Silverman* v. *Silverman,* 5 Mass. App. Ct. 793, 793 (1977)
("[M]ere words, if they tend . . . to wound the feelings to such a degree as to
affect the health of the party [can constitute cruelty]. . . . [D]eeply wounded
sensibility and wretchedness of mind can hardly fail to affect the health").

[29]The plaintiff has requested an award of appellate attorney's fees and costs

in connection with this appeal, which request we deem justified. See G. L. c. 151B, § 9. The plaintiff may file a petition with this court for reasonable attorney's fees and costs in accordance with the procedure prescribed in *Yorke Mgmt.* v. *Castro*, 406 Mass. 17, 20 (1989), within thirty days after the issuance of the rescript. See Mass.R.A.P. 23, 367 Mass. 921-922 (1975). The defendant shall have twenty days from the date of such filing to respond.