CYNTHIA SALTEN *vs.* JAMES L. ACKERMAN.

No. 04-P-1458.

Suffolk. June 10, 2005. - October 26, 2005.

Present: PERRETTA, DREBEN, & GELINAS, JJ.

*Divorce and Separation,* Child support, Division of property, Attorney's fees.
*Parent and Child,* Child support. *Evidence,* Expert opinion. *Witness,* Expert.

The judge in a divorce action did not abuse her discretion when determining
the amount of child support by taking into account, inter alia, the husband's
evasiveness as to his partnership's finances and his lack of credibility
[872-873], and she was warranted in according significant weight to the
husband's conduct when dividing the marital property [873-874]; moreover,
the judge did not abuse her discretion in declining to permit testimony
from either the husband or the husband's accountant regarding the
husband's reported tax loss [874-875] or in awarding attorney's fees to the
wife [875].

COMPLAINT for divorce filed in the Suffolk Division of the
Probate and Family Court Department on September 21, 2001.

The case was heard by *Nancy Gould,* J.

*Stephen D. Fried* for the defendant.

*Edward J. Juel* for the plaintiff.

DREBEN, J. This is an appeal by the husband from those por-
tions of a judgment of divorce which awarded the wife eighty-
eight percent of the marital assets and ordered him to pay what
he claims is excessive child support. He also argues that the
judge erred in awarding the wife counsel fees. We affirm.

1. *Facts.* We take our facts from the "rationale" of the judge
as supplemented by uncontested evidence, noting that the judge
found the husband's testimony "not credible" and the wife's
testimony "highly credible." At the time of the divorce in 2004,
the parties had been married for thirty-six years. Until 1990,
when they adopted a child, the couple, both lawyers, contributed
economically and otherwise to the marriage. After the child was

adopted, the couple agreed with the birth mother that the wife would stay at home and be a full-time mother.

The husband worked assiduously as an attorney, earning approximately $400,000 a year, and the parties enjoyed an upper-middle income lifestyle. In 1995, the husband began to have dealings with a man named Walter Grover that led to a series of disastrous investments financing lotteries in Lithuania and Russia. Not only did the husband use his own funds and borrow heavily, but he also took funds from joint accounts with his wife, from their daughter's college savings in a Uniform Gifts to Minors Account (UGMA), from a trust fund for his wife's nephew (a minor), and from a trust established by his then-deceased father for his mother (ninety years old at time of trial) in which the husband and his sister had equal vested remainder interests. The amounts, sources of funds, and dates of these investments were recounted in the husband's answers to interrogatories and are set forth in the margin.[1]

The wife was only aware of about $190,000 of his investments, which the judge found to total almost $2 million despite the parties' agreement that under no circumstances would the husband invest more than $200,000. There is no dispute that

---

[1]According to the husband's answers to interrogatories, his first investment was on September 13, 1995, when he took $50,000 from a joint account with the wife; the next was on October 17, 1995, for $90,000 borrowed from Norwich Savings Society (Norwich); followed by investments made on November 21, 1995, of $50,000, financed one-half from a joint account with the wife and one-half from the UGMA of their daughter; on January 8, 1996, of $25,000 borrowed from Norwich; on January 17, 1996, of $50,000, part borrowed from Norwich and part from their daughter's UGMA; on August 21, 1996, of $25,000 borrowed from Norwich; on or about September 5, 1996, $375,000 borrowed from Norwich; on October 21, 1996, $47,000 taken from their daughter's UGMA; on November 19, 1996, $47,000 borrowed from Norwich; on November 27, 1996, $190,000 from husband's HR-10 (retirement account); on May 1, 1997, $50,000 (source of funds not remembered); on May 27, 1997, $100,000 borrowed from Norwich; on October 9, 1997, $100,000 (source not remembered); on December 27, 1997, $12,139 taken from daughter's UGMA; another in late December, $100,000, from the Laurence J. Ackerman (husband's father) trust; on January 12, 1998, $29,203, $2,881 from joint account with wife, $26,322 from daughter's UGMA; another in early January, $100,000 borrowed from wife's father; March 3, 1998, $470,000 from husband's HR-10; another (date unknown), $25,000 from James Weingrod Trust (a trust for wife's nephew of which husband was sole trustee). (The total of the sums listed by the husband was $1,935,342.)

these high risk ventures were a failure, although the husband claims only $1 million was lost and not $1.7 million as found by the judge and as reflected on the husband's tax returns. At trial he claimed, without producing any evidence other than his own answers to interrogatories, that there were some investment returns and repayments.

In January, 1998, before the disastrous investments came to light, the husband requested a voluntary one-year leave of absence from his law firm. During his unpaid leave of absence, his firm informed him that they would not allow him to return. According to the husband, this was because he had not told them about his investment activities in Russia and Lithuania. He resigned from the firm in the summer of 1998.

In 1998, when the wife learned about the catastrophic losses to the marital estate and took control of the remaining joint bank accounts, she spent significant sums and incurred liabilities to help the husband reclaim his life and his career. She paid some $20,000 to a lawyer to represent the husband in negotiations with his former firm in an attempt to regain his position, $25,000 or $30,000 for his treatment at a facility to overcome what he described as his "over-extending myself [and becoming] totally irrational,"[2] $10,000 to a placement firm to help him find an appropriate job, $100,000 to pay back the loan the husband had obtained from her father, and $13,500 for the husband's taxes; most important, she agreed to refinance the marital home in order to pay off a loan to her husband in the amount of $500,000. The judge found the wife "made this decision [to refinance] to assist the husband in avoiding a bankruptcy filing . . . that might end his career." She also returned to work, taking a position as a lawyer for the Federal court system.

Her father (ninety years old at time of trial), who had been generous throughout the marriage,[3] gave her substantial sums so

[2]The husband testified that the facility was for people "having problems, of one kind or another; sometimes it's alcohol, sometimes it's drugs, sometimes it's other addictive — In my case, it was not being able to get out of this investment situation." The wife had all the funds "because . . . I shouldn't have them, I had misappropriated things, I'd thrown them away, basically."

[3]He had contributed ninety-five percent of the savings for his granddaughter's college education, which had been untouched until used improperly by the husband.

that the couple's daughter could continue in private school and with other activities. As a result of his generosity, his estate became smaller, and the wife's expectant share is now about $200,000.

The husband was unemployed for more than a year. Thereafter he began working for another attorney, and in January, 2001, became that attorney's partner. When pressed, the husband acknowledged that in 1999, before he became the attorney's full-time employee, the attorney told him that he "had been earning [annually] several hundred thousand dollars and sometimes five hundred thousand dollars." There was testimony as to the partnership agreement and evidence that the husband was a fifty percent partner, but the husband claimed he earned less than his partner. The husband's billing rate at the time of trial was $200-$250 per hour and sometimes $300. He disclaimed knowledge of what his partner made in 2001 or thereafter. On his tax return for 2001, the husband reported income of about $158,000. His financial statement of September 3, 2003, listed earned income of approximately $140,000; the wife's financial statement of September 12, 2003, listed income from employment of about $62,500.

The judge found that after the disclosure of the investments, the husband

> "continues to 'loan' money to his Russian colleagues notwithstanding the devastating financial losses the family has suffered and in violation of the Domestic Relations Restraining Order on Assets. In the year 2000 and 2001, the Husband admits that he loaned Sergei Bogomolov at least $27,000 and as much as $50,000 to export beef udders from the United States to Russia. It is unclear as to whether Mr. Bogomolov has repaid any portion of this 'loan.' Although the house occupied by the Wife and daughter is mortgaged solely as a result of the Husband's unilateral[] investment losses, the Husband has loaned Mr. Bogomolov money to pay the latter's housing costs."

The wife filed a complaint for divorce on September 21, 2001.

2. *Financial provisions of divorce judgment.* Prior to the divorce judgment, exclusive of the marital home which was

valued at $1.3 million, the wife had assets of $193,882, and the husband $672,500. The judgment ordered the husband to transfer his interest in the marital home (a condominium) to the wife, to pay the principal and interest on the mortgage which had an approximate balance of $275,000, to repay the UGMA, and to transfer certain other assets to the wife. After the division, the wife was left with assets valued at $1,913,882 and the husband with assets valued at $252,500.[4] The husband was also ordered, if and when he receives his share of inherited assets, to transfer to the wife ninety percent of his share under his father's trust as an asset division (the husband's loan of $100,000 from the trust to be repaid first from his half share), and in addition, he was ordered to pay forty percent of his share of his mother's estate as child support.[5] The judge also ordered the husband to pay $2,000 per week as child support.

3. *Discussion.* a. *Child support.* The expenses of the wife for the child were unchallenged. These were paid by the wife's salary, and by the wife's father's significant contributions, which were necessitated by her inability to pay for all the child's accustomed expenses.

The husband faults the judge for not making findings as to his present income and also claims that child support and the mortgage payments on the wife's condominium constitute ninety-two percent of his income. The lack of a finding as to the husband's income is attributable to the husband's failure to provide sufficient information. The husband was evasive about the income of the partnership, and he insisted that he did not know what his equal partner earned in 2001 or thereafter. In determining the amount of child support, the judge could take into account the husband's evasiveness as to the finances of the partnership and his lack of credibility, the reduction in his taxes by reason of his carry forward losses, and his ability to lend $27,000-$50,000 to his Russian colleague. "Each spouse in a

---

[4] A difference of almost $1.7 million.

[5] The value of the father's estate was estimated as being $480,000-$500,000, and the mother's as $1,125,000.

The husband does not challenge the designation of the share from his mother's estate as child support. Compare *Passemato* v. *Passemato*, 427 Mass. 52, 57 (1998).

divorce proceeding has the obligation to provide adequate financial data to the other spouse and to the court. A judge is entitled, barring special circumstances, to draw all reasonable inferences against a party who fails to do so." *Grubert* v. *Grubert*, 20 Mass. App. Ct. 811, 822 (1985).

b. *Division of marital property.* "The appropriate weighing and balancing of the [G. L. c. 208,] § 34 factors, and the resulting equitable division of the parties' marital property, is left to the judge's broad discretion." *Kittredge* v. *Kittredge*, 441 Mass. 28, 43 (2004) (*Kittredge*). A judgment as to property division will not be reversed "unless it is plainly wrong and excessive." *Id.* at 44, quoting from *Baccanti* v. *Morton*, 434 Mass. 787, 793 (2001).

The husband argues that the present judgment is plainly wrong, and that he is being punished for his bad investments. It is true that in determining how to distribute the assets, the judge heavily weighed the husband's conduct — his "reckless investments and dissipation of substantial marital assets" which were "almost catastrophic for this family." She also recognized the wife's significant contributions both economically and otherwise.

The husband takes particular issue with the finding that $1.7 million was dissipated when, in his view, only $1 million was lost.[6] As the wife points out in her brief, the effect of the husband's investment losses on the marriage and on the marital estate was substantially greater than the actual monies lost. The husband was forced to leave his lucrative job at his former law firm, and as a result was unemployed or underemployed for almost two years. The wife's father's estate was further depleted, the wife was forced to work, and by agreeing to refinance the condominium, she became liable for a large debt of the husband. She also repaid her father for the loan he made to the husband.

The recent *Kittredge* case, *supra*, is relevant in considering the judge's disposition of assets. There, the wife argued that the judge in dividing the assets should have treated all the husband's

---

[6]As indicated earlier, evidence of the claimed returns on his investments was not supplied.

gambling losses as dissipation,[7] and not just ten percent of them. The court explained that "dissipation" as used by other jurisdictions meant a "spouse's expenditures for his or her own personal enjoyment at a time when the marriage is apparently coming to an end, from which it can be inferred that the spouse's expenditures were made in order to deprive the other spouse of his or her fair share of the marital estate." *Id.* at 36. Here, as in *Kittredge*, no such inference may be drawn. The court in *Kittredge* considered that dissipation, however defined, "must be viewed within the context of the statutory factors governing the equitable division of marital property under G. L. c. 208, § 34. . . . 'Conduct' that has harmed the marriage or the marital estate may be viewed negatively, and considered as a factor that would diminish that spouse's equitable share of marital property." *Id.* at 37-38. In *Kittredge*, there was no error in refusing to treat all the gambling losses as dissipation because the effect of the gambling did not "undermine the family's financial security or cause sacrifices in their high standard of living." *Id.* at 42. Moreover, the wife there was aware of the husband's gambling. *Ibid.* Here, unlike *Kittredge*, the husband's reckless actions were unknown to the wife, and their effect was to deprive the wife and daughter of the standard of living enjoyed during marriage. As such, the judge was warranted in according significant weight to the husband's conduct. While we recognize that the division is vastly disproportionate, and is one that we might not have made, we do not conclude that the judge abused her broad discretion.[8]

c. *Evidentiary matters and counsel fees.* The husband wanted to call Albert Goslin, his accountant, as a witness to support his claim that the tax loss as reported on the tax return was larger than the monies that were actually lost. Counsel for the wife objected. Although the husband had informed her of the wit-

---

[7]Highly speculative investments are not "easily distinguishable" from gambling losses. Cf. *Kittredge, supra* at 41, quoting from ALI Principles of the Law of Family Dissolution: Analysis and Recommendations § 4.10 Reporters' Notes to comment e, at 766 (2002), and noting the converse, namely, "that gambling losses are not 'easily distinguishable' from 'speculative investment' for purposes of dissipation analysis."

[8]Unless the wife was accorded the marital home, the couple's largest asset, the wife's standard of living would be further drastically reduced.

ness's name, he had not given her a curriculum vitae until the Friday before trial, and as a result, counsel did not know that an expert witness would be called. The husband, who appeared pro se, indicated "I'm not a tax lawyer, I can't explain it. Mr. Goslin can . . . ." Although the husband argues that he was not calling Goslin as an expert but rather as the accountant who had prepared the return, the judge evidently did not agree, as she declined to permit Goslin to testify. Trial judges have "extensive discretion . . . with respect to both the process of discovery and the admission of evidence, particularly expert testimony." *Beaupre* v. *Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 485 (2000). See *Kearns* v. *Ellis*, 18 Mass. App. Ct. 923, 924 (1984). The judge did not abuse her broad discretion in excluding Goslin's testimony or in subsequently excluding testimony on this issue by the husband, who had stated he was not a tax lawyer.

d. *Counsel fees.* The judge also acted within her discretion in awarding counsel fees of $32,357.13 to the wife "due to [the husband's] protracting this litigation." Not only is the trial judge in the best position to determine whether the husband prolonged the case, but an examination of the docket shows various motions filed by the wife supporting the judge's finding, e.g., a motion for compliance with Supplemental Rule 410, two complaints for contempt,[9] and a motion for sanctions. The husband has shown no basis for overturning the award. See *Drapek* v. *Drapek*, 399 Mass. 240, 248 (1987).

*Corrected judgment of divorce*
*nisi affirmed.*

---

[9]An additional complaint for contempt was filed after the judgment.