ROBERT TRENT JONES, INC. *vs.* ALAN S. CANTER.

Hampden.  May 22, 1984. — February 11, 1985.

Present: GREANEY, C.J., ARMSTRONG, & WARNER, JJ.

*Contract*, What constitutes, Implied, Performance and breach, Parties, Damages. *Corporation*, Corporate entity.

Where the evidence at the trial of a civil action tended to prove that the plaintiff, a designer of golf courses, was entitled to recover from the defendant land developer the fair value of its services that the defendant had received and utilized, the defendant's motion for a directed verdict, which did not differentiate between express contract and quasi contract as the basis for recovery, was correctly denied. [324]

A designer of golf courses was entitled to recover from a land developer the fair value of its planning services that the developer had received and utilized, and the recovery was not limited to the amount which the designer was to be paid if its plan had been rejected by the landowner. [325]

The jury at the trial of a civil action were warranted in finding that an individual defendant was liable to the plaintiff, a designer of golf courses, for the fair value of its services in preparing a plan which the defendant had received and utilized, where the evidence tended to prove that the plaintiff was never clearly informed whether the defendant was acting in his individual capacity or as the principal officer of a corporation engaged in recreational land development. [325-326]

BILL IN EQUITY filed in the Superior Court on May 17, 1974.

The case was tried before *John F. Murphy, Jr.,* J.

*Michael G. West* for the defendant.

*Jonathan B. Hunt* for the plaintiff.

ARMSTRONG, J. In 1972 the plaintiff, a designer of golf courses, did a layout for a course in Adams, at the foot of Mount Greylock, which was to be known as the Greylock Glen Golf Course. The plaintiff was paid $3,000 for the design; it asserts, on a contract claim, that it is entitled to more. It named several defendants but recovered a verdict ($65,000, reduced

by remittitur to $40,000) only against Canter. The case is here on Canter's appeal from the ensuing judgment. Canter's position is (1) that no contract was ever entered into; (2) that the contract alleged by the plaintiff, if found to have come into existence, was fully satisfied by the $3,000 paid; and (3) that, in any event, the alleged contract was, as matter of law, with a corporation named Elco Resort Developers, Inc., of which Canter was "a principal officer," and not with Canter in his individual capacity.

The plaintiff was first approached in the autumn of 1971, by one Dragone, who was president of Planning Associates, Inc., a planning consultant located in Springfield. Rulewich, an employee of the plaintiff, outlined to Dragone the price for the plaintiff's services: $3,000 for the preparation of a "route plan" and, if the plan should be used, ten percent of the construction cost (in connection with which the plaintiff would do the working drawings and supervise the construction). The route plan would remain the plaintiff's property and could not be used by the owner without employing the plaintiff for the additional services. If the owner did not use the route plan his sole obligation would be to pay the $3,000.

In December, 1971, Dragone brought together on the Adams site Rulewich, Canter, a master planner, and an architect; these men discussed plans for a year-round recreational complex, including a hotel and facilities for skiing and golf. The evidence most favorable to the plaintiff was that Canter was introduced to Rulewich (by Dragone) as "the principal, the owner, the money man on the project."[1] Shortly after that meeting Dragone sent Rulewich a schematic plan of the Mount Greylock area, indicating in his cover letter that "[t]he area[s] in red are parcels controlled by Elco Resort Developers, Inc. The area in black is presently under negotiation for acquisition." On January 19, 1972, the plaintiff mailed a draft contract to Dragone, which contained the terms previously described and left blank the name of the party with whom the plaintiff would be contracting.

---

[1] The portions of the transcript that have been included in the appendix do not indicate Canter's response to the introduction.

On January 31, 1972, Dragone wrote to Rulewich:

> "Pursuant to our telephone conversation, you are advised that your firm has been chosen to provide the professional expertise in connection with the design of the proposed golf course at the above captioned location. We are reviewing your Draft Proposal and will contact you with any questions we might have."

The letter went on to confirm the first of a series of working meetings with the architect and the master planner in New York City. At such a meeting on February 9, 1972, Rulewich asked Canter about the draft contract, and Canter replied that he saw no problem with it but that Dragone "was his man" in that respect and would handle "the final negotiations." After at least one other such meeting the plaintiff completed its proposed route plan and submitted it to the architect. Thereafter, in various applications to town boards for needed approvals, it was represented that the plaintiff was the designer of the golf course.

There appear to have been no further dealings between the parties until October 13, 1972, when the plaintiff submitted an invoice for $3,000 to Dragone and reminded Dragone of the still unexecuted draft contract, asking that it be executed and returned. On December 21, 1972, the plaintiff directed a letter "to Mr. A. S. Canter, President, Elco International Corp." in Springfield, bringing the unpaid invoice to his attention and seeking execution of the written contract, "which I request you complete by filling in the name of the entity with whom we are contracting and having [the copies] properly executed." In May, 1973, Dragone confirmed by telephone that the contract would be executed and the $3,000 invoice paid.

Several more months passed, however, before the plaintiff received a letter from Dragone dated December 29, 1973, informing the plaintiff that "the Owner of the Project reviewed the Preliminary Route Plan and subsequently made a decision to select a Proposal from another Golf Course Architectural Firm." Enclosed was a Planning Associates, Inc., check for

$3,000, signed by Dragone. There was evidence of a telephone conversation with Dragone around the same time, in which Dragone confirmed to the plaintiff that "he had been acting as Mr. Canter's agent" and that construction of the course had started. Dragone was asked if "it was a question of whether our fee was too much, and [his] words were 'You said it. I didn't.'" Dragone also asserted in that conversation that the course under construction was "substantially and totally different from that prepared by [the plaintiff]." Later on a representative of the plaintiff visited the course and learned that the layout was substantially identical to that in the plaintiff's route plan — a fact not now contested.

For the proposition that no contract was ever entered into, Canter relies primarily on two cases, *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 216 (1935), and *Tull* v. *Mister Donut Dev. Corp.*, 7 Mass. App. Ct. 626, 630 (1979), which stand for the principle that when the parties contemplate signing a written contract, there is a "strong presumption" that they do not intend to be bound by earlier negotiations or agreements until the final terms are settled and the contract executed. But in this case it has been established as a fact that the plaintiff's services were received and utilized by Canter (whether as an individual or as the principal officer of Elco Resort Developers, Inc., is not here important), and the receipt of that benefit, in circumstances where it is manifest that no gift was intended, gave rise to an obligation to pay independent of express contract. *LiDonni* v. *Hart*, 355 Mass. 580, 583 (1969). *Anisgard* v. *Bray*, 11 Mass. App. Ct. 726, 729-730 (1981). See 1 Corbin, Contracts § 71 (1963). For present purposes it is not necessary to determine whether Canter's use of the plaintiff's route plan served as an implied acceptance of the terms of the draft contract or merely gave rise to an obligation to pay for the fair value of those services. Canter's motion for a directed verdict, like the complaint, did not differentiate between express contract and quasi contract as a basis for recovery. As the plaintiff was entitled to recover for its services even in the absence of an express contract, the motion was correctly denied.

There is no basis for Canter's contention that the obligation to pay was limited to $3,000. That was the plaintiff's price for a route plan if rejected by the owner. It was open to the jury to find that the fair value of a route plan not so rejected was the proposed total contract price less the costs the plaintiff would have incurred if it had provided the working drawings and supervised the construction. The jury's finding of damages, as remitted by the judge, cannot be said on the record before us to be clearly erroneous.

The more substantial question concerns Canter's personal liability. He testified that he acted at all times as the principal officer of Elco Resort Developers, Inc., not in his individual capacity. The jury could properly find, however, on all the evidence, that the capacity in which Canter was acting was not made clear to the plaintiff[2] and that the plaintiff was depending on Canter's execution of the written contract to disclose "the entity with whom we are contracting." There is some suggestion in the record that Canter may have managed his business affairs through more than one corporation.[3] Compare *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 618-619 (1968). "[W]hen there is . . . serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting . . . , a court 'need not consider with nicety which of them' ought to be held liable for the act of one corporation 'for which the plaintiff deserves payment.'" *Id.*, at 619, quoting from *W. W. Britton, Inc.* v. *S. M. Hill Co.*, 327 Mass. 335, 338-339 (1951). If

---

[2] The proposition stated in the text may be overly generous to Canter, in light of the evidence that Canter stated to Rulewich that Dragone was "his man" for negotiating the contract terms, and Dragone stated to Rulewich that Canter was "the owner, the principal" of the project. But Dragone's statement may be thought of as a way of identifying Canter as the man in control of the project, without identifying the capacity in which he exercised control.

[3] Here we refer both to the letter addressed to Canter as president of "Elco International Corp." and to the testimony of an employee of the plaintiff, who stated that he "knew that Mr. Canter was the owner, but I didn't know the correct corporate name under which he was operating."

Canter had executed the contract,[4] identifying the contracting party as Elco Resort Developers, Inc., he could thereby have precluded personal liability. See Restatement (Second) of Agency § 323(1) (1958). If we assume that Canter received and used the plaintiff's services solely as agent of Elco Resort Developers, Inc., he is nevertheless liable as agent "unless [he] gives such complete information concerning his principal's identity that he can be readily distinguished." Restatement (Second) of Agency § 321 comment a (1958). See *Norfolk County Trust Co.* v. *Green*, 304 Mass. 406, 407 (1939); *Webarm Diecasting, Inc.* v. *Green Bros. of Worcester, Inc.*, 347 Mass. 69, 71 (1964). The evidence warranted a finding that Canter became personally liable for the plaintiff's services.

*Judgment affirmed.*

---

[4] Canter testified that he was the only person who had authority to execute a contract for Elco Resort Developers, Inc.