Greco, PJ.
In May of 2007, the plaintiff, Ken Musi (“Musi”), sued Bob Blair (“Blair”), Joseph A. Berkman (“Berkman”), and The Gloucester Boat Building Co. (“Gloucester Boat”) for breach of contract. In his complaint, Musi stated that Gloucester Boat was a partnership “owned and operated” by Berkman and Blair. He further alleged that he entered into an agreement with the defendants whereby the defendants agreed to build and deliver a boat for him for the price of $33,425.00; that he made deposits toward that amount totaling $16,712.50; and that despite his demands for the boat, the defendants never manufactured or produced it. In his complaint, Musi sought the return of his deposits, plus multiple damages and attorney’s fees under a separate count pursuant to G.L.c. 93A
All three defendants defaulted when they failed to attend a case management conference, and default judgments were entered against them in the amount of $49,327.01 (i.e., the amount of the deposits, doubled, plus attorney’s fees). Only Blair appealed that judgment. He prevailed on that appeal with the result that the judgment against him was vacated and the case was returned to the trial court for trial. See Musi v. Berkman, et al., 2009 Mass. App. Div. 38, 41.
Gloucester Boat was incorporated in 2002 and was authorized to issue 100,000 shares of common stock. The named officers of the corporation were Joseph and Carol Berkman to whom were issued a total of 10,000 shares of stock. On January 21, 2004, Berkman, as president of the corporation, and Blair, as an investor in the corporation, entered into an agreement whereby Blair was “granted 40% ownership” in the stock of the corporation “in exchange for his financial and personal contributions made to the corporation during the year 2003.” In May of 2006, a new entity entered the picture; Gboats, LLC (“Gboats”) was formed as a domestic limited liability company with its principal office in Essex, Massachusetts. Its certificate of organization stated its business to be “the manufacture, marketing and sale of boats.” Berkman, Blair, and two others were named as the company’s managers, and Gloucester Boat was listed as having a sixty (60%) percent membership interest, based on the contribution of its operating assets. The record before us contains no formal partnership agreement between Berkman and Blair. Against this backdrop, we review the testimony at trial in the light most favorable to Musi.
Sometime in October or November of 2004, Musi and Berkman had lunch in Virginia, during which they discussed boats, Berkman having told him that he built boats. As a result of that conversation, Musi placed an order with Berkman to buy a boat and gave him a check for $8,356.25 as a deposit. The color of the boat’s hull was *53 to be “sea foam.”[2] Musi testified that on November 9,2004, he received a letter from “Gloucester Boat Building Company’ sent by Blair, stating that “your boat is going to be in the mold in a few days” and seeking a further deposit of $8,356.25. When Musi’s attorney elicited this testimony, he made reference to Exhibit 3. Exhibit 3, however, is not a letter. Rather, it refers to an email to Musi from Berkman indicating that they were “to start [his] boat in the next few days,” and that he would be getting an invoice from Blair. In none of these communications was it indicated that Gloucester Boat was a corporation. Musi did not make a second deposit. Instead, in early December of 2004, he “[g]ot on a plane and flew up” to Massachusetts, went on a boat ride with Berkman, and had lunch with Blair and Berkman. Musi testified that they “showed [him] a nice time and asked [him] for the second deposit, which [he] gave them.”
There appears to have been no further contact between these parties until a series of e-mails in 2005. In May, Musi sent an e-mail in which he stated that he was “starting to get nervous” about the boat and the deposits he had made. On May 6, 2005, he received a response from “Gloucester Boats Building Company [gboats@gloucester boats.com]” stating “[a]U is well with your boat,” and indicating that further details would be given later that day. There appears to have been no further contact until August and September of 2005. In an August 17th e-mail, Musi complained to Blair that he had no feedback following the December meeting, that Berkman had “told [him] the hull was coming in and he was ready to start” building the boat, that he had e-mailed Berkman thirty times without getting a response, and that he wanted his money back. Blair responded the next day by e-mail. He stated that he understood Musi’s “view;” that he was not making “any excuses” for Berkman, and that he would speak to Berkman about the matter. He then added the following:
I can tell you that in my role as an investor in this fledgling company, I have been on a bit of a roller coaster over what to do and or [sic] whether to continue to try and push-this business forward. After last season the business was on its knees because of a variety of production reasons and the outlook was bleak. The business has no cash to speak of and must perform well over the coming months to reverse the outcome of last year. So far progress is very good, [sic] we have eliminated or corrected most of the production problems and have resolved a substantial portion of carry over short term debt with vendors. Although I am riot a corporate officer I have *54 stepped in to act as comptroller, partly to protect my investment and mostly to ensure that resources are applied to get the product delivered. Your position will be a real problem at this point [sic] money is spent on the the production and a quick refund is not in the cards.
Blair went on to say that they should be able to find a customer to buy Musi’s boat, expressed his “hope” that they “could reach an agreement that keeps [Musi] in the picture,” and that he would “do whatever can be done to make the situation work out.” When Musi inquired a couple of weeks later about Blair’s “latest efforts” to sell the boat to somebody else, Blair responded that he was “presently talking with someone who has an interest in the boat.” At trial, Musi testified that if any representative of Gloucester Boat had told him that the company was having production problems and “couldn’t produce the boat,” he would not have dealt with them. At some point, Blair promised to make periodic payments to him as a way of refunding his deposits, but no such payments were made.
The demand letter under G.L.c. 93A, written by Musi’s lawyer, was submitted to the jury on the issue of “whether [Blair] was working as an individual, within a partnership, or whether he was working as part of a corporation.” That letter, dated March 7,2007, was addressed to “Joseph Berkman and Robert Blair dba Gloucester Boat Building Company and Gloucester Boat Building Company, Inc.” Counsel stated in the demand letter that “[a]t no time did [Musi] deal with Gloucester Boat Building Company, Inc. as no corporate declaration was made by the defendant.” Blair responded to this letter by e-mail on April 13,2007, stating that “[w]e make this offer as a counter offer in settlement of the funds which you have already paid toward the purchase” of the boat: if Musi would pay $29,000.00, as opposed to the balance due of $16,712.50 on the boat originally ordered, he would get a different boat worth $54,000.00. That offer was not accepted. Musi also testified that Blair was not present when he had discussions in Virginia with Berkman about buying a boat and when the “Order Confirmation” was made out; that Berkman, but not Blair, signed that confirmation; and that he would have bought the boat whether he was buying it from a corporation or from a company.
While Blair’s testimony was generally self-serving and could have been rejected by the jury, his position was that he helped Berkman with marketing and organizing “a strategy to get dealerships in place,” and that he received no compensation. As to the deal with Musi, Blair acknowledged that Berkman went to Virginia at his suggestion in order to contact a dealership having nothing to do with Musi. When Berkman returned to Massachusetts, he informed Blair of the deal he had made with Musi and asked him to send Musi “a confirmatory email letting him know how the deal works.” Blair did so. While he testified that he did not draft or sign the order confirmation referred to above and had nothing to do with the building of the boat, he acknowledged sending the August 18, 2005 e-mail in response to Musi’s complaint about the delay in getting the boat he ordered. Blair also acknowledged that he was “a manager of Gboats, LLC,” which he conceded meant being an “officer,” and that Gloucester Boat was a member of Gboats, LLC and owned 60% of Gboats, LLC. When asked if “Gloucester Boat Building Company, Inc. is you and Berkman,” he answered, ‘Yes ... Mr. Berkman is the president of Gloucester Boat Building Company, Inc. and I own an interest in that corporation.”
*55 At the close of the plaintiffs case, Blair moved for a directed verdict, which was denied. Blair, however, did not renew his motion for a directed verdict at the close of all the evidence. The trial judge discussed with counsel what instructions he would give and the form of the verdict slip he would submit to the jury. Any concerns expressed by Blair’s attorney about the proposed instructions and verdict slip did not rise to the level of an objection. At the close of this conference, but before closing arguments, the trial judge stated, “Gentlemen, I’m going to bring the jurors in. If there’s anything I need to figure out further, we’ll talk before I charge.” After closing arguments, the trial judge further discussed his charge and the verdict slip with counsel, who expressed varying and contrasting views on both items. The trial judge brought that discussion to a close, stating, “Again, at this point I’d like to have everybody agree but I’m pretty comfortable with the way that reads and if there’s an objection I’ll note it and if I’m wrong I’ll be proved [sic].” After the charge, and after the jury left to deliberate, no objections were made by either party. Instead, the parties preliminarily discussed the G.L.c. 93A claim that the judge had reserved for himself. After the jury returned its verdict for the plaintiff in the amount of $16,712.50, the matter was continued for the hearing under c. 93A
Upon the conclusion of the hearing on the c. 93A claim (at which no new evidence was submitted), the trial judge took the matter under advisement and then made written findings and rulings. He found that at the lunch and boat ride in Massachusetts, Musi was “assured that production of the boat was imminent,” and that the “representations made by Blair and Berkman to induce” the second payment “were knowingly and willfully false.” He also found that the representation in the e-mail of May 6, 2005 that “all is well with your boat” was patently false. Based on the communications between the parties after August 17, 2005, the trial judge found that they contained “vague, evasive and unconvincing excuses;” that Blair would “certainly have known” of Gloucester Boat’s shaky financial situation at the time Musi made the second deposit; that Blair’s representation that the money already spent on the production of Musi’s boat prevented the company from returning his deposit had to be false; and that the representations on the progress on the building of Musi’s boat were false as well. Finally, the trial judge found that a timely and “sufficient” c. 93A demand letter was sent to Blair.
Based on these findings, which the judge noted included evidence of “Blair’s own conduct, as well as the acts of Berkman which can reasonably be imputed to Blair,” the court found that Blair violated c. 93A, noting that
[t]he failure to disclose the state of GBBC [Gloucester Boat] while accepting Musi’s money then stringing him along with a combination deaf ears, false promises, and blatant lies is the exact type of behavior that c. 93A proscribes. Two and a half years from the time Musi made his initial down payment until the date that the demand letter was sent gave more than ample time for Blair to produce a boat or return Musi’s money. The fact that a refund was not provided even after the boat Blair alleged to be Musi’s was ultimately “liquidated’ highlights the unfairness characteristic of the defendants’ behavior throughout this transaction. In short, even if their business was in difficult straits, it is simply unacceptable for Blair and his partner to resort to unfair and deceptive practices to keep themselves afloat.
*56 The court thereupon ordered judgment for Musi in the amount of $33,425.00, i.e., the two deposits doubled, plus attorneys fees in the amount of $45,319.70, and interest in the amount of $4,846.17, for a total of $83,590.87.
In his notice of appeal and in the statement of the issues in his brief, Blair essentially argues that the evidence presented at the jury trial was insufficient to warrant the finding that he was personally liable. As noted above, after Blair moved for a directed verdict upon the close of the plaintiffs case, he proceeded to present evidence on his own behalf, but failed to renew his motion for a directed verdict at the close of all the evidence at the jury trial. By failing to renew his motion, he has waived his right to test the sufficiency of the evidence. Michnik-Zilberman v. Gordon’s Liquor, Inc., 390 Mass. 6, 9 (1983). See also Hammell v. Shooshanian Eng’g Assocs., Inc., 73 Mass. App. Ct. 634, 640 (2009) (“Evidence from a defendant may fill gaps in a plaintiffs prima facie case. ... For purposes of appeal, a defendant therefore cannot retrospectively freeze the evidence into its state at the conclusion of the plaintiffs case.”). Thus, any possible relief available to Blair on this appeal must be limited to issues related to the finding against him on the c. 93A claim. As to c. 93A, Blair raises two procedural issues, to wit, that a demand letter was not properly sent, and that even if it were properly sent, a reasonable tender had been made in response so as to limit any recovery to the terms set out in the tender. Blair also argues that the evidence was not sufficient to warrant a finding that he personally violated c. 93A.
At least 30 days before filing his complaint, Musi was required to mail or deliver to Blair “a written demand for relief, identifying [himself] and reasonably describing the unfair or deceptive practice relied upon and the injury suffered.” G.L.c. 93A, §9(3). Musi’s complaint was filed on July 20, 2007. Over four months earlier, Musi’s attorney had sent a demand letter addressed to “Joseph Berkman and Robert Blair dba Gloucester Boat Building Company and Gloucester Boat Building Company, Inc.” The letter chronicles Musi’s efforts either to get the boat he ordered, or to get his deposits refunded. With respect to Blair, the letter notes at length the e-mail exchanges of August 17 and 18, 2005 (discussed above) in which he alleges Blair made representations he knew to be false. The letter goes on to state that “Blair described himself to be only an investor and not an officer,” but that “Blair is the partner of Berkman.” In addition to false representations, it is alleged in the letter that the failure to put Musi’s deposits in escrow amounted to a c. 93A violation. The letter was timely, and reasonably described the practices at issue. Cf. Richards v. Arteva Specialties S.A.R.L., 66 Mass. App. Ct. 726, 736-738 (2006). Moreover, we need not address where, or the method by which, the letter was sent. It is clear that Blair received it; indeed, he responded to it.
We also conclude that the trial judge was warranted in finding that the settlement suggested by Blair was not reasonable. The proposed settlement was more in the nature of a counteroffer. Blair was suggesting that instead of paying the balance due on the boat ordered ($16,712.50), Musi would pay a greater amount ($29,000.00), and in return he would get a better boat, one worth $54,000.00. Thus, he would pay $12,287.50 more than contemplated in the original deal, but would end up owning a boat theoretically worth $20,575.00 more. “[A] seller asserting the protection of the statutory limitation of damages appearing in §9(3) has the burden *57 of proving the reasonableness of the settlement tendered.” Kohl v. Silver Lake-Motors, Inc., 369 Mass. 795, 799 (1976). The problem here is that Musi was not looking for a better boat. He wanted either the boat he agreed to buy, or his money back; he was not looking to spend more money. In these circumstances, the trial judge was justified in concluding that the proposed offer in settlement was not reasonable.
The substantive issue as to whether the evidence was sufficient to warrant the finding by the judge of a c. 93A violation is appropriately before-us for review. See M.G. PEELIN AND J.M. CONNORS, CIVIL PROCEDURE IN THE MASSACHUSETTS DISTRICT COURT, §12.11, at 365 (4th ed. 2009) (“Under Mass. R. Civ. P., Rule 52 (c), the trial judge in a jury-waived case must issue written findings of fact if any party timely submits proposed findings, and may issue them even if no proposals are filed. While findings of fact, as such, may not be appealed to the Appellate Division, a party may appeal on the basis that the trial court’s findings are ‘clearly erroneous’” [emphasis in original] [citation omitted]). “A finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” Marlow v. City of New Bedford, 369 Mass. 501, 508 (1976), quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). However, the “clearly erroneous” standard “does not protect findings of fact or conclusions based on incorrect legal standards.” Kendall v. Selvaggio, 413 Mass. 619, 621 (1992). See also Barboza v. McLeod, 447 Mass. 468, 469 (2006). Finally, “a judge may make independent and, therefore, different, findings [from those of the jury] on the c. 93A aspect of a case that arises from the same facts which gave rise to parallel common law claims.” Wyler v. Bonnell Motors, Inc., 35 Mass App. Ct. 563, 567 (1993), cited in Poly v. Moylan, 423 Mass. 141, 151 (1996). See also Bressel v. Jolicoeur, 34 Mass. App. Ct. 205, 211 (1993).
A claim for relief under G.L.c. 93A, §9 is “neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action such as tort for fraud and deceit.” Slaney v. Westwood Auto, Inc., 366 Mass. 688, 704 (1975). With respect to traditional tort concepts, “[a] corporate officer is personally liable for a tort committed by the corporation that employs him, if he personally participated in the tort by, for example, directing, controlling, approving, or ratifying the act that injured the aggrieved party.” Townsends, Inc. v. Beaupre, 47 Mass. App. Ct 747, 751 (1999). On the one hand, this Division has said that “‘[a] corporation ... can only act through its agents’..., and negotiations by a corporate officer regarding a corporate obligation do not render the officer personally liable.” Williams v. Vanaria, 2000 Mass. App. Div 162, 164, quoting Sunrise Prop., Inc. v. Bacon, Wilson, Ratner, Cohen, Salvaze, Fialko & Fitzgerald, P.C., 425 Mass. 63, 66 (1997). On the other hand, an agent may be “nevertheless liable as agent ‘unless [he] gives such complete information concerning his principal’s identity that he can be readily distinguished.’” Robert Trent Jones, Inc. v. Canter, 19 Mass. App. Ct. 321, 326 (1985), quoting RESTATEMENT (SECOND) OF AGENCY §321 comment a (1958).
As to concepts specifically underlying c. 93Aliability, “[o]ne can violate... [c. 93A] by failing to disclose to a buyer a fact that might have influenced the buyer to refrain from the purchase. But ‘[t]here is no liability for failing to disclose what a person *58 does not know.”’ Greenery Rehabilitation Group, Inc. v. Antaramian, 36 Mass. App. Ct. 73, 78 (1994), quoting Underwood v. Risman, 414 Mass. 96, 100 (1993). “Indeed, a predictive insight about the future operations of a going business in relation to changing market conditions would hardly fit under the heading of ‘fact’ and would seem at most in the nature of opinion.” Id. Moreover, it has been observed that “liability under Chapter 93A does not attach to a party simply because it had a relationship to the defendant that engaged in the complained-of conduct; each defendant must have taken an ‘active role’ in that conduct.” Speakman v. Allmerica Fin. Life Ins., 367 F. Supp. 2d 122, 142 (D. Mass. 2005). Cf. Reisman v. KPMG Peat Marwick LLP, 57 Mass. App. Ct. 100 (2003), where the Appeals Court ruled that summary judgment should not have been awarded to the defendant where it was “in direct contact with [the plaintiff] during the transaction, ... assigned a partner to advise him” who sat with the plaintiff during negotiations, and “was responsible for the structure of the transaction and reviewed all documents related to it.” Id. at 125a.
Finally, in addition to the above considerations, “it is clear from the statutory language [of c. 93A] that, in order to recover, a plaintiff must establish both that an unfair or deceptive act or practice has been committed and that the commission of that act or practice has caused him an injury. The plaintiff must show that there was a causal connection between the deception and the loss, and that the loss was foreseeable as a result of the deception.” Lord v. Commercial Union Ins. Co., 60 Mass. App. Ct. 309, 317 (2004). See also Cohen v. Liberty Mut. Ins. Co., 41 Mass. App. Ct. 748, 755 (1996) (“[A] causal connection between the defendant’s wrongdoing and the resulting damages is still a part of a c. 93A calculus.”).[3]
In this case, there was no evidence that Blair played any role either in the initial agreement made in Virginia between Musi and Berkman whereby Musi agreed to buy a boat, or in Musi’s making of the initial deposit of $8,326.55. Blair’s suggestion that Berkman go to Virginia was completely unrelated to the chance encounter between Musi and Berkman. The same cannot be said, however, about the second deposit. While Blair did not go on the boat ride with Berkman and Musi, it can certainly be inferred from Musi’s testimony that at lunch both Berkman and Blair asked him for the second deposit. It was after this encounter over lunch that Blair indicated that he was only an investor in Gloucester Boat, that he was not a corporate officer, and that the Gloucester Boat was having financial difficulties, thus indicating that Musi was dealing with a corporation. The communications between Blair and Musi thereafter related to Blair’s efforts to sell a boat so as to enable the refund of Musi’s deposits. Blair also promised to make periodic payments to Musi. There was no evidence concerning why Blair was unsuccessful on both scores.
*59 In these circumstances, based on Blair’s acts alone, that is, without attributing Berkman’s acts to Blair, a finding of a c. 93A violation against Blair with respect to Musi’s agreement to buy the boat and to pay the first deposit was not warranted under the standard set out in Marlow. There was no evidence that Blair in any way induced Musi to make that deal, or to put money down for a boat. Therefore, Blair’s acts did not cause the loss of that first $8,326,55. This harm had occurred before Blair actively entered the picture. However, Blair personally participated in the securing of the second deposit. At this point, Blair had been actively involved in the financial management of the company for almost a year. He was much more than a passive investor. It could be inferred that he was in a position to know whether the company in a timely manner could produce the boat ordered by Musi. Moreover, Blair’s later activity on behalf of the company, including making a counteroffer in response to Musi’s demand letter — while not related to the second deposit — could have been considered as confirmation of Blair’s key role in the overall operation of the company. The evidence was thus sufficient to establish a causal connection between Musi’s loss of his second deposit and Blair’s own acts in violation of c. 93A
Accordingly, the judgment for the plaintiff in the amount of $16,712.50 pursuant to the jury’s verdict on the contract claim is affirmed. However, the judgment for the plaintiff on his claim under G.Lc. 93A against defendant Blair is affirmed only as it relates to the plaintiff’s loss of the second deposit, to wit, a loss in the amount of $8,356.25. Thus the “double damages” portion of the judgment against Blair must be reduced from $16,712.50 to $8,356.25. The prior award of attorney’s fees is not changed. The case is returned to the Peabody District Court so that the reduction in damages and any resulting reduction in prejudgment interest may be made.
So ordered.

 There was testimony from Paul Amaral (“Amaral”), a representative of a company in Seekonk, Massachusetts that builds fiberglass molds for boats. The factfinder could have believed that Amaral supplied fiberglass moldings for boats to be sold by Gloucester Boat. Amaral first dealt with Berkman in January of 2005; he did not have any dealings with Blair until May or June of 2005. Amaral received an order from Berkman on May 11,2005 for a yellow boat; he never received an order from people connected to Gloucester Boat for a sea foam colored boat. He received an order for a second boat three months later. Berkman and Blair were the “contact names” on that order.

 See also Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 445 Mass. 790 (2006), where the Court stated that “[t]he plaintiffs apparently assume that the availability of statutory damages of twenty-five dollars, see G.L.c. 93A, §9(3), in lieu of actual damages, eliminates the need to prove a loss resulting from a defendant’s deceptive conduct. The statutory damage provision does not supplant the requirement to prove causation under §9. It merely eliminates the need to quantify an amount of actual damages if the plaintiff can establish a cognizable loss caused by a deceptive act.” Id. at 799 n.18.